**Wayne E. SILVERMAN, d/b/a Allied Stenotype Reporters**

v.

**The UNITED STATES.**

No. 517–80C.

United States Court of Claims.

June 2, 1982.

Mike Johnston, Houston, Tex., for plaintiff.*

Cheryl S. Rome, Washington, D. C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D. C., for defendant; Denis E. Hynes, F.T.C., Washington, D. C., of counsel.

Before KASHIWA, BENNETT and SMITH, Judges.

## OPINION

PER CURIAM:

This case comes before the court on defendant's motion, filed April 23, 1982, requesting that the court adopt as the basis for its judgment in this case the recommended decision of Senior Trial Judge Mastin G. White, filed March 18, 1982, pursuant to Rule 134(h), since plaintiff has filed no notice of intention to except and the time for so filing under Rule 141 has expired. Upon consideration thereof, since the court agrees with the recommended decision, as hereinafter set forth,** defendant's motion is granted and the recommended decision adopted as the basis for the judgment in this case. Accordingly, plaintiff is not entitled to recover and the petition is dismissed, and judgment is entered for defendant on its counterclaim in the sum of $3,714.

## OPINION OF TRIAL JUDGE

WHITE, *Senior Trial Judge.* In this rather unusual case, the plaintiff, an experienced court reporter who maintains his office in Fort Worth, Texas, seeks compensation in the amount of $2,482.88 from the United States for reporting services in connection with proceedings before the Federal Trade Commission ("FTC").

The defendant has counterclaimed in the alternative for $7,608.19 or at least for $1,484.62,[1] representing payments previously made to the plaintiff.

---

* Joseph E. Earnest, Fort Worth, Tex., was attorney of record for and represented the plaintiff at the trial. No post-trial requested findings of fact or brief were filed for the plaintiff.

** Although the court adopts the trial judge's separate findings of fact, which are set forth in his report, they are not included herein since such facts as are necessary to the decision are contained in his opinion.

1. The counterclaim, as originally filed, was for $7,488.19 or at least for $1,353.75, but the amounts were increased in the defendant's

## The Facts

In August 1976, the FTC entered into a contract with Acme-Stentran Computer Reporting Company ("Stentran"), of Vienna, Virginia, under which Stentran was to furnish stenographic reporting services for the FTC throughout the country during a period of time which, as extended, continued until May 26, 1978.

In 1977, Stentran entered into an oral agreement with the plaintiff, pursuant to which the plaintiff was to act as a subcontractor under the contract mentioned in the preceding paragraph and, in that capacity, was to perform stenographic reporting services in connection with certain FTC hearings, including a number of hearings which were held during 1978 in Dallas, Texas, and which are involved in this case.

Under the procedure agreed upon between Stentran and the plaintiff, the plaintiff was to transcribe the testimony taken at the FTC hearings and forward the transcripts to Stentran, the prime contractor, together with invoices covering the plaintiff's charges based on agreed-upon prices. Stentran was then supposed to pay the plaintiff for his services. The transcripts prepared by the plaintiff were to be furnished by Stentran to the FTC in accordance with the prime contract between Stentran and the FTC; and Stentran was to receive payment from the FTC under the prime contract.

The FTC did not, at any time, have a written contract with the plaintiff.

Stentran got into financial difficulties; and as of the beginning of May 1978, Stentran was behind in its payments to the plaintiff. At that time, Stentran owed the plaintiff for the reporting services involved in some 33 days of FTC hearings, where the transcripts had already been prepared by the plaintiff and forwarded to Stentran, and then had been furnished by Stentran to the FTC. Also, the plaintiff had prepared, and was holding, two additional transcripts of hearings held in different proceedings on the same day. The total amount which Stentran owed the plaintiff, including the charges for the two transcripts which the plaintiff was then holding, was $10,091.07.

The plaintiff was aware that Stentran was having financial difficulties, and the plaintiff was apprehensive that Stentran might become bankrupt, owing him money. On or about May 2, 1978, the plaintiff called an official of Stentran in Vienna, Virginia, on the long-distance telephone, and asked when the plaintiff could expect to receive the money that was due him from Stentran. The plaintiff did not receive a satisfactory response from the Stentran official. Following this conversation, the plaintiff decided that he would send the two FTC transcripts, which he was then holding, to Stentran, c.o.d.

On May 9, 1978, the plaintiff transmitted to Stentran in Vienna, Virginia, via Airborne Freight Corporation, a c.o.d. shipment which contained the two transcripts that the plaintiff had been holding, and which demanded payment of the entire amount of $10,091.07 then owing by Stentran to the plaintiff.

The c.o.d. shipment contained a covering letter from the plaintiff to Stentran, dated May 9, 1978, which stated in part as follows:

> I don't like to do this, but I told you it would have to be done. We are putting you on a c.o.d. basis and are sending it for $10,091.07, which includes the total of the enclosed invoices which we have not been paid for. * * *

The plaintiff mailed to the Secretary of the FTC a copy of his May 9, 1978, letter to Stentran. The duties of the Secretary of the FTC included (among other things) supervision over the 1976 contract between the FTC and Stentran.

On May 12, 1978, Airborne Freight Corporation informed the plaintiff via telephone that Stentran had refused to accept the c.o.d. shipment. The plaintiff directed the carrier to retain the shipment in Washington, D. C., pending further instructions.

post-trial brief on the basis of evidence developed at the trial.

Promptly after his conversation with Airborne Freight Corporation, the plaintiff on May 12, 1978, wrote a letter to the Secretary of the FTC, informing the latter that Stentran had refused to accept the c.o.d. shipment, and stating that he had informed the carrier to hold the c.o.d. shipment in Washington until further notice. The plaintiff's letter contained the specific request "that you make no payments to them [Stentran] for any bills you might owe them until we collect our money so that we can forward these transcripts in."

Approximately a month before May 12, 1978, the FTC had paid Stentran under the prime contract for the reporting services involved in some 14 days of hearings held during January, February, and March 1978 and reported by the plaintiff. The plaintiff had forwarded the transcripts of these hearings to Stentran, and Stentran, in turn, had furnished them to the FTC. The plaintiff's charges to Stentran for these services amounted to $4,364, but Stentran had not paid any of this amount.

Then, on May 12, 1978 (and obviously before the FTC in Washington, D. C., received the plaintiff's letter of that date from Fort Worth, Texas), the FTC paid Stentran under the prime contract for the reporting services involved in 9 additional days of hearings held during February, March, and April 1978 and reported by the plaintiff. The plaintiff had forwarded the transcripts to Stentran, and Stentran had furnished them to the FTC. The plaintiff's charges to Stentran for these services totalled approximately $1,834, but Stentran had not paid any of this amount.

Thus, before the FTC received the plaintiff's letter of May 12, 1978, asking the FTC not to make any further payments to Stentran, the FTC had already paid Stentran for the reporting services involved in 23 days of hearings reported by the plaintiff. The transcripts of these hearings had been forwarded by the plaintiff to Stentran, and the latter had furnished the transcripts to the FTC. The plaintiff's charges to Stentran for these services totalled $6,198, but none of this amount was paid by Stentran.

On May 22, 1978, a senior official in the Office of the Secretary of the FTC called the plaintiff on the long-distance telephone relative to the c.o.d. shipment which the plaintiff had sent to Stentran. The official, who was aware of the amount demanded in the c.o.d. shipment and that it contained a couple of transcripts, stated to the plaintiff that he was calling to inquire whether the plaintiff would release the c.o.d. shipment to the FTC. The plaintiff's initial response was that he could not release the c.o.d. shipment until he received the money that was owing to him, as he was apprehensive that Stentran would go bankrupt and that he did not wish to become involved in a proceeding of that sort. The FTC official told the plaintiff that he was the man with whom the plaintiff should deal if the plaintiff wanted to get paid, as he had the authority to approve vouchers for payment; that the FTC wanted the transcripts; and that if the c.o.d. shipment was released, he would see to it that the plaintiff received payment, even if Stentran went bankrupt.

It has previously been indicated that, before the senior FTC official called the plaintiff on May 22, 1978, the FTC had already paid Stentran under the prime contract for the reporting services involved in 23 days of hearings reported by the plaintiff. The transcripts had been prepared by the plaintiff and forwarded to Stentran, and Stentran had furnished them to the FTC. The plaintiff's charges to Stentran for these services totalled $6,198, but none of this amount had been paid by Stentran.

On the basis of the May 22, 1978, telephone call from the FTC official, the plaintiff got in touch with Airborne Freight Corporation via telephone and told the carrier to release the c.o.d. shipment to the FTC without collecting for it, and that he (the plaintiff) would pay the carrier for the transportation charges. Later in the same day, the plaintiff confirmed this directive in writing. Pursuant to the plaintiff's authorization, Airborne Freight Corporation released the c.o.d. shipment to the FTC on or about May 26, 1978.

On June 23, 1978 (or a month after the conversation between the senior FTC official and the plaintiff), the FTC paid Stentran under the prime contract for the reporting services involved in 8 days of hearings held during April 1978 and reported by the plaintiff. The plaintiff had prepared the transcripts of these hearings and forwarded them to Stentran, and Stentran had furnished the transcripts to the FTC. The plaintiff's charges for these services totalled $3,154, none of which had been paid by Stentran. This payment to Stentran by the FTC was made after the FTC received the plaintiff's letter of May 12, 1978, asking the FTC not to make further payments to Stentran, and after the senior FTC official made the promise of payment to the plaintiff on May 22, 1978.

It apparently was not until sometime in July 1978 (or after the prime contract with Stentran was terminated) that the senior FTC official who had discussed the c.o.d. shipment with the plaintiff on May 22, 1978, actually looked into the matter of the FTC's relationship with Stentran and the possibility of the FTC making a direct payment to the plaintiff for the reporting services rendered by the plaintiff. The senior FTC official was not a contracting officer, with expressly delegated authority to enter into contracts on behalf of the FTC, but he did have authority to approve vouchers for payment as representing charges for goods or services furnished to the FTC in accordance with existing contracts. He concluded that the FTC had not paid Stentran for a number of hearings which the plaintiff had reported and for which the plaintiff's charges amounted to $7,488.19. On the basis of his conclusion (which was mathematically incorrect), the senior FTC official approved and authorized payment on invoices totalling $7,488.19, copies of which the plaintiff had submitted in the released c.o.d. shipment.

Pursuant to this authorization, the proper certifying officer of the FTC caused a check in the amount of $7,488.19 to be issued to the plaintiff on July 24, 1978; and the check was received by the plaintiff on July 29, 1978.

Later, on November 14, 1978, the FTC paid the plaintiff the additional sum of $120.

To a considerable extent, the payments by the FTC to the plaintiff represented double payments by the FTC for reporting services. Such payments covered the plaintiff's charges: of $4,364 for 14 days of hearings that were also involved in the FTC's payment to Stentran on April 10, 1978; of $852 for 4 days of hearings that were also involved in the FTC's payment to Stentran on May 12, 1978; and of $1,651 for 5 days of hearings that were also involved in the FTC's payment to Stentran on June 23, 1978 (made after the May 22, 1978, agreement between the senior FTC official and the plaintiff). Thus, the FTC paid both Stentran and the plaintiff with respect to some 23 days of hearings that were reported by the plaintiff, and for which the plaintiff's charges, paid by the FTC, totalled $6,867.

There was no duplication of payments by the FTC with respect to some 11 days of hearings reported by the plaintiff. The FTC paid Stentran, and did not pay the plaintiff, with respect to 7 days of hearings, on which the plaintiff's charges totalled $2,482.88; and the FTC paid the plaintiff, and did not pay Stentran, with respect to 4 days of hearings, on which the plaintiff's charges amounted to $741.85.

In the present action, the plaintiff is suing for the $2,482.88 which the FTC failed to pay him. The defendant counterclaims in the alternative for $7,608.19 or at least $1,484.62, representing payments made by the FTC to the plaintiff.

*Discussion*

This court has dealt in a number of cases with the problem of whether a subcontractor has standing to sue the Government for compensation due the claimant under a subcontract with a government contractor, in a situation where the prime contractor has failed or refused to pay the amount due the subcontractor. The court has uniformly held that the subcontractor cannot properly

maintain an action in such a situation. The rationale for the ruling was stated as follows in *United Electric Corp. v. United States*, 227 Ct.Cl. ——, ——, 647 F.2d 1082, 1084 (1981):

> * * * The controlling axiom is that the United States may be sued only to the extent that it allows its sovereign immunity to be waived. Through 28 U.S.C. § 1491, the United States has consented to be sued for money damages in certain restricted circumstances, the only relevant one being on the basis of a contract (either express or implied-in-fact) between the United States and the claimant. In the absence of a direct contractual link (express or implied-in-fact), no enforceable contractual right against the United States exists, and therefore a subcontractor, in privity only with its private prime, cannot recover directly from the Government for amounts owed it by the prime. * * * [Footnote omitted.]

Similar holdings will be found in (among other cases): *Severin v. United States*, 99 Ct.Cl. 435, 442 (1943), *cert. denied*, 322 U.S. 733, 64 S.Ct. 1045, 88 L.Ed. 1567 (1944); *Somerset Machine & Tool Co. v. United States*, 144 Ct.Cl. 481, 482, *cert. denied*, 361 U.S. 825, 80 S.Ct. 73, 4 L.Ed.2d 69 (1959); *Fairchild Industries, Inc. v. United States*, 223 Ct.Cl. 315, 320, 620 F.2d 807, 809 (1980).

Therefore, any possibility of recovery by the plaintiff in the present action depends upon proof of the existence of a contract (either express or implied in fact) between the plaintiff himself and the Government. *Putnam Mills Corp. v. United States*, 202 Ct.Cl. 1, 8, 479 F.2d 1334, 1337 (1973).

In this connection, the evidence in the record clearly shows that the plaintiff never had any written contract with the FTC relative to the reporting services on which the present action is based. Hence, it is necessary to consider whether a contract (either express or implied in fact) arose to any extent between the plaintiff and the Government under the circumstances connected with the telephone conversation between the senior FTC official and the plaintiff on May 22, 1978.

It is my opinion that the facts show the creation of a contract between the plaintiff and the Government, but that it was less extensive than the plaintiff contends in the present action.

■ The matter of the two transcripts which the plaintiff had prepared and was holding (through the agency of Airborne Freight Corporation) on May 22, 1978, will be considered first. At the time when the senior FTC official called the plaintiff on the telephone and asked the plaintiff to release the c.o.d. shipment to the FTC, no contract existed between the plaintiff and the FTC, and the plaintiff was not under any obligation to deliver the transcripts to the FTC. The FTC had not paid Stentran (or anyone else) for these transcripts, and the FTC was aware that Stentran had not paid the plaintiff for them. The FTC wanted to get possession of the transcripts (it obviously would have been inconvenient and expensive to reschedule the particular hearings in order to obtain new transcripts). The senior FTC official promised the plaintiff that if the plaintiff would release the c.o.d. shipment to the FTC, he would see to it that the plaintiff received payment. In reliance on the promise of the senior FTC official, the plaintiff released the c.o.d. shipment, containing the two transcripts, to the FTC. The plaintiff's action in this respect clearly constituted consideration for the promise of payment, insofar as it related to the plaintiff's charges for the two transcripts thus delivered to the FTC.

Although the senior FTC official was not a contracting officer for the FTC, with expressly delegated authority to make contracts for the Government, the FTC retained and utilized the transcripts which the plaintiff released to the FTC on the basis of the official's promise. By accepting the benefits flowing from the senior FTC official's promise of payment, the FTC ratified such promise and was bound by it. The problem of ratification was considered in an order issued by this court in *Philadelphia Suburban Corp.*, 217 Ct.Cl. 705, 707 (1978); *also cf. Prestex, Inc. v. United States*, 162 Ct.Cl. 620, 628, 320 F.2d 367, 373 (1963).

Accordingly, the facts show at least the creation of an implied-in-fact contract with respect to payment for the two transcripts which the plaintiff furnished directly to the FTC. A contract implied in fact is a contract "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Baltimore & Ohio R.R. v. United States*, 261 U.S. 592, 597, 43 S.Ct. 425, 426, 67 L.Ed. 816 (1923). These elements are present in this case, insofar as payment for the two transcripts is concerned.

The conversation of May 22, 1978, between the senior FTC official and the plaintiff, as summarized in the record, might be construed as indicating that the promise of payment by the senior FTC official related only to the two transcripts which the plaintiff was then holding (through the agency of the Airborne Freight Corporation). However, the subsequent actions by the two men showed that they both understood the promise of payment as having a wider scope.

The plaintiff, for example, showed by his actions that he understood the promise of payment as relating to all of the plaintiff's charges for reporting services, totalling $10,091, as to which the plaintiff had not received payment from Stentran. The senior FTC official, on the other hand, showed by his actions that he understood the promise of payment as relating to the plaintiff's charges for reporting services that were not involved in previous payments by the FTC to Stentran. Thus, the plaintiff and the senior FTC official had a common understanding to the extent—and only to the extent—that the official's promise of payment (conditioned on the release of the c.o.d. shipment by the plaintiff) related to the plaintiff's charges for reporting services which were not involved in previous payments by the FTC to Stentran.

As stated earlier in the opinion, the plaintiff's unpaid charges as of May 22, 1978, totalled $10,091. However, as of that date, the FTC had already paid Stentran under the prime contract for reporting services involving some 23 days of hearings reported by the plaintiff, on which the plaintiff's charges amounted to approximately $6,197. Therefore, to the extent of the common understanding of the scope of the promise of payment, the FTC was committed to pay the plaintiff $3,894.

The consideration for the promise to pay has already been mentioned. As there is no indication of fraud or misrepresentation on the part of the plaintiff, the court is not concerned with the adequacy of the consideration furnished by the plaintiff. *Mills v. United States*, 187 Ct.Cl. 696, 700–01, 410 F.2d 1255, 1258 (1969).

It has been mentioned earlier in the opinion that the FTC, as a result of a mistake on the part of the senior FTC official, paid the plaintiff $7,608, rather than the amount of $3,894 involved in the May 22, 1978, promise of payment and in the contractual agreement between the FTC and the plaintiff. Thus, the plaintiff was overpaid to the extent of $3,714.

Having been overpaid by the FTC under the agreement of May 22, 1978, the plaintiff is not entitled to recover on its claim in the present litigation, and the petition should be dismissed.

On the other hand, the defendant is entitled to recover on its counterclaim to the extent of $3,714, representing the amount of the overpayment which the FTC made to the plaintiff through mistake. *Aetna Casualty & Surety Co. v. United States*, 208 Ct.Cl. 515, 520, 526 F.2d 1127, 1130, *cert. denied*, 425 U.S. 973, 96 S.Ct. 2172, 48 L.Ed.2d 797 (1976).

## CONCLUSION OF LAW

Upon the findings of fact, set forth in the trial judge's report, and the foregoing opinion, which are adopted by the court, the court concludes as a matter of law that the plaintiff is not entitled to recover; and the petition is therefore dismissed.

The court further concludes as a matter of law that the defendant is entitled to recover $3,714 on its counterclaim.