Timothy A. JANOWSKY and Peggy
J. Janowsky, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

No. 90–3846 C.

United States Claims Court.

Aug. 6, 1991.

David E. Vandercoy, Valparaiso, Ind., for plaintiffs.

Samuel C. Watkins, with whom were Asst. Attys. Gen. Stuart M. Gerson, David M. Cohen and Terrence S. Hartman, Washington, D.C., for defendant, Stephen Medlin, Federal Bureau of Investigation, Washington, D.C., of counsel.

## OPINION AND ORDER

TURNER, Judge.

This opinion supplements an earlier unpublished opinion. *Janowsky v. United States*, No. 90–3846 (Cl.Ct. April 19, 1991). In that earlier opinion, we raised *sua sponte* but did not rule on two potentially dispositive issues: (i) whether plaintiffs' claim that the FBI breached an implied-in-fact contract to compensate them for their services and for the use of their business as a front for an undercover FBI investigation is subject to the Contract Disputes Act (CDA) and (ii) whether plaintiffs' claim that the FBI took their business for law enforcement purposes without just compensation fails as a matter of law due to their allegation that they freely agreed to allow the FBI to use their business.

The parties have briefed these two issues and we now address them. We conclude that count I of the complaint (contract claim) is subject to the CDA. Accordingly, count I should be dismissed for lack of jurisdiction due to plaintiffs' failure to file a certified claim with the FBI and to receive a final decision on the claim prior to bringing suit. We further conclude that count II of the complaint (inverse condemnation claim) should be dismissed for failure to state a claim upon which relief can be granted, because plaintiffs' allegation that they agreed to assist in the investigation and to let the FBI use their business is sufficient to defeat their inverse condemnation claim as a matter of law.

### I

### A

The following statement of facts is based on the allegations of the complaint and on the procedural history of this dispute.

Plaintiffs Timothy and Peggy Janowsky own and operate Geno's Vending in Gary, Indiana. In October 1984, Timothy Janowsky agreed to assist the FBI in an undercover investigation into an alleged bribery and extortion ring involving corrupt police,

local government officials and organized crime. In late 1984, Special Agents Michael Kahoe and Phillip Hultgen, working out of the Gary, Indiana FBI office, asked Janowsky to allow Geno's Vending to be used as a front for the investigation. Through the business, Janowsky was to purchase and to distribute gambling equipment and to infiltrate the alleged crime ring.

Special Agent Kahoe promised that the FBI would either purchase Geno's Vending at its fair market value at the conclusion of the investigation (less any rewards paid to Janowsky) or provide financing for a purchaser. In return Janowsky agreed to engage in gambling and other activities as directed by the FBI, to record surreptitiously his conversations with targets of the investigation and to testify before grand juries and at any trial of individuals charged as a result of the investigation.

Geno's Vending was under FBI control and was run for the benefit of the FBI from December 1984 until early 1988. During this time the business could not be operated at a profit, and as a result of the investigation the value of the business was permanently reduced. In addition, the Janowskys purchased gambling devices and made other expenditures at the FBI's direction but were never reimbursed.

The Janowskys brought suit in a federal district court against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671–2680. The Janowskys alleged that the Special Agents in Gary negligently failed to obtain authority from FBI headquarters to reimburse them for expenditures during the investigation and negligently failed to guard against their financial loss.[1]

The government moved to dismiss the complaint on the ground that the FTCA excepts from its coverage actions arising out of misrepresentations by government officials. 28 U.S.C. § 2680(h). The district court granted the government's motion, of-

---

1. The Janowskys alleged in their FTCA action that Timothy Janowsky helped to obtain the arrests and convictions of several organized crime figures. They do not make a similar allegation in their complaint here.

fering a twofold rationale. First, it held that to the extent plaintiffs alleged reliance on incorrect assurances by FBI agents that they would receive compensation, the claim was barred under the misrepresentation exception to the FTCA. Second, the court held that if the Janowskys did not rely on assurances of compensation but rather were volunteers, then the FBI's failure to compensate them was not tortious as a matter of law. *Janowsky v. United States,* 713 F.Supp. 282 (N.D.Ind.1989). On appeal, the Seventh Circuit affirmed, agreeing with both aspects of the district court's ruling. *Janowsky v. United States,* 913 F.2d 393 (7th Cir.1990).

### B

After the Seventh Circuit's ruling, the Janowskys brought the present action. In their two-count complaint, plaintiffs seek relief for the FBI's breach of an implied-in-fact contract to compensate them for their services and for the use of their business or, in the alternative, just compensation for the taking of their business for public use.[2]

■ Defendant moved to dismiss the complaint in its entirety for lack of subject matter jurisdiction, arguing that the Special Agents in Gary lacked authority to bind the FBI to a contract and lacked authority to take Geno's Vending for use in an undercover investigation. We ruled that defendant's motion as it related to the contract claim was not directed to the court's jurisdiction, but rather was directed to the sufficiency of the complaint; further, we converted the motion as it related to the contract claim to a motion for summary judgment since defendant had submitted matters beyond the pleadings relevant to the contract claim. *Janowsky v. United States,* No. 90–3846, slip op. at 3–4 (Cl.Ct. April 19, 1991) (unpublished). We went on to conclude that defendant's motion to dismiss the contract claim was not

ripe for decision for two reasons. First, plaintiffs argued persuasively that without discovery they could not respond meaningfully to defendant's assertion that the Special Agents in Gary lacked authority to bind the FBI in contract. Second, there was a potential jurisdictional defect which we raised *sua sponte,* namely, whether plaintiffs were required to perfect their claim in accordance with the CDA prior to filing suit.[3] *Id.* at 4–5. With respect to the inverse condemnation claim, we rejected the government's argument that as a matter of law the Special Agents in Gary lacked authority to direct the operations of a private business in furtherance of an undercover investigation. *Id.* at 7–8. We raised *sua sponte* the question whether an inverse condemnation claim is stated when the property owners allege that they consented to the government's use of their property. *Id.* at 8.

### II

### A

■ For purposes of determining whether we have jurisdiction over the contract claim, we take as true the allegations in the complaint. *See Hamlet v. United States,* 873 F.2d 1414, 1416 (Fed.Cir.1989) (in determining whether it has jurisdiction, the court must assume the allegations of the complaint to be true). Thus, we assume that plaintiffs agreed to allow Geno's Vending to be used as a front for the FBI investigation, that in exchange Special Agent Kahoe promised that plaintiffs would be paid for their services and for the use of Geno's Vending, that plaintiffs assisted in the investigation over a four-year period in accordance with their promise and that plaintiffs have not received any payment from the FBI. Thus, plaintiffs allege all that is required to state a claim for breach of contract.

---

2. Plaintiffs do not explicitly denominate their two counts as alternative claims, but we construe them as such. We do not understand plaintiffs' position to be that they are entitled to just compensation *in addition* to damages for breach of contract.

3. A federal court is obliged to inquire whether it has jurisdiction, even if the parties are silent on the issue. *Hambsch v. United States,* 857 F.2d 763, 765 (Fed.Cir.1988), *cert. denied,* 490 U.S. 1054, 109 S.Ct. 1969, 104 L.Ed.2d 437 (1989).

## B

The provisions of the CDA, 41 U.S.C. §§ 601–613, govern "any express or implied contract ... entered into by an executive agency for—(1) the procurement of property ... [or] (2) the procurement of services...." 41 U.S.C. § 602(a). As a statutory condition precedent to an action based on a contract subject to the CDA, the contractor must first submit a written claim to the contracting officer, and the contracting officer must render a final decision on the claim. 41 U.S.C. §§ 605(a), 606, 609(a)(1). Furthermore, for claims exceeding $50,000, the contractor must accompany the claim to the contracting officer with a written certification in accordance with 41 U.S.C. § 605(c)(1).

The statutory requirements of submission of a claim to the contracting officer, properly certified when the amount sought exceeds $50,000, and the rendering of a final decision on the claim have been interpreted as jurisdictional prerequisites to an action on the claim. *See United States v. Grumman Aerospace Corp.*, 927 F.2d 575, 579 (Fed.Cir.1991) (reviewing line of cases interpreting submission of a claim to the contracting officer, properly certified if necessary, and the rendering of a final decision on the claim, as jurisdictional prerequisites to an action on the claim).

Plaintiffs seek $643,200 in their claim that the FBI breached an implied-in-fact contract to pay plaintiffs for their services and for the use of Geno's Vending. Assuming *arguendo* that we could consider the Janowskys' administrative claim to the FBI under the FTCA[4] to be a claim under the CDA as well,[5] and assuming *arguendo* that we could consider the FBI's denial of that claim to be a final decision of the

contracting officer, plaintiffs concede that they have never executed a written certification in accordance with 41 U.S.C. § 605(c)(1). Thus, if the contract alleged in count I is subject to the CDA, count I must be dismissed for lack of jurisdiction.

## C

■ In determining whether the contract between plaintiffs and the FBI is subject to the CDA, we begin with the plain language of the statute. *See Martin J. Simko Construction v. United States*, 852 F.2d 540, 542 (Fed.Cir.1988) (when interpreting a statute, court should look first to the language of the statute). If the statute is unambiguous, the court's inquiry ends "unless there is a clearly expressed legislative intention contrary to the language of the statute itself." *Id.*

Title 41 U.S.C. § 602(a) provides:

*Unless otherwise specifically provided herein*, this Act [the CDA] applies to *any* express or *implied contract* ... entered into by an executive agency for—

(1) the procurement of property, other than real property in being; [or]

(2) the procurement of services....

(Emphasis added.)

Section 602(a) is unambiguous, *Coastal Corp. v. United States*, 713 F.2d 728, 730 (Fed.Cir.1983), and it encompasses count I of plaintiffs' complaint. Count I seeks relief for breach of an implied-in-fact contract. The contract was entered into by the FBI, an executive agency. *See* 41 U.S.C. § 601(2) (for purposes of the CDA, the term "executive agency" includes, *inter alia*, executive departments listed under 5 U.S.C. § 101); 5 U.S.C. § 101 (the Department of Justice is an executive department); 28 U.S.C. § 531 (the FBI is "in

---

**4.** Plaintiffs were required to submit an administrative claim to the FBI prior to filing suit under the FTCA. 28 U.S.C. § 2675(a) (an action shall not be instituted under the FTCA "unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing").

**5.** In *Contract Cleaning Maintenance v. United States*, 811 F.2d 586, 592 (Fed.Cir.1987), the court stated:

We know of no requirement in the [Contract] Disputes Act that a "claim" must be submitted in any particular form or use any particular wording. All that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim.

the Department of Justice"). Finally, the contract was for the procurement of the Janowskys' services, *i.e.*, their assistance in the undercover investigation, including the ostensibly normal operation of their business. Plaintiffs further allege that Special Agent Kahoe "agreed to the purchase of the plaintiffs' business by the FBI." Presumably this prong of the alleged implied-in-fact contract pertained to procurement of property.

### D

■ Only a "clearly expressed legislative intention" contrary to the plain language of the statute, *Martin J. Simko Construction, supra,* would lead us to conclude that the CDA does not apply to the Janowsky contract. The section-by-section analysis of the CDA in the Senate report on the bill simply parrots the wording of section 602; there is no elaboration as to the meaning of the term "implied contract" and no indication that there are exceptions to that term. *See* Sen. Report no. 95–1118, 95th Cong., 2d Sess. 17 (1978) (*reprinted in* 1978 U.S.Code Cong. & Admin.News 5235, 5251). The drafters contemplated that "[t]he [CDA] would have *broad* application in order to unify the diverse and often inconsistent procedures presently existing among the procuring agencies...." *Id.* (emphasis added).

Plaintiffs, relying on *Institut Pasteur v. United States,* 814 F.2d 624 (Fed.Cir.1987), argue that the overarching policy goal of the CDA was to promote competition for government contracts thereby ensuring the lowest price for the government. According to plaintiffs, concerns about competition for government contracts have no relevance in the area of informant services.

Thus, conclude plaintiffs, the CDA should not apply.

Plaintiffs' description of the central purpose of the CDA better describes the central purpose of the Competition in Contracting Act (CICA), P.L. 98–369 (Title VII), 98 Stat. 1175 (codified in various provisions of titles 10, 31, 40 & 41 U.S.C.). CICA is directed to agency procedures leading up to the award of a contract where full and open competition is a relevant concern.[6] By contrast, the CDA is directed to agency and court procedures for resolving disputes between contractors and the government over contract performance after award. "[T]he CDA deals with contractors, not with ... bidders." *United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1368 (Fed. Cir.1983). The uniform dispute-resolution procedures engendered by the CDA may play a role in promoting competition, but it by no means is a central role. We also note that while *Institut Pasteur* did discuss one of Congress' apparent aims in enacting the CDA, the court's holding in that case was simply that the transaction at issue was "closer to being donative in nature than it was to the contracts for procurement of property or services [covered by the CDA]." 814 F.2d at 628.

■ The question is whether the FBI and the plaintiffs must follow statutorily-mandated administrative dispute resolution procedures after an implied contract for procurement of services and property has been entered into and performed. This question must be answered in the affirmative. An exception to the plain language of section 602(a) could be made only if there were a *clearly expressed* legislative intention to allow such exception, and broad policy arguments do not demonstrate such a clear expression.[7] Rather than attempt-

---

6. Section 2711 of CICA amended section 303 of the Federal Property and Administrative Services Act, 41 U.S.C. § 253, and provides that "an executive agency in conducting a procurement for property or services shall obtain full and open competition through the use of competitive procedures in accordance with [CICA and corresponding] regulations...."

7. Plaintiffs' argument that the central purpose of the CDA was to promote competition for government contracts ignores the only explicit

legislative statement of the CDA's purpose. Section I of the Senate report on the CDA reads in full:

### I.  PURPOSE
The Contract Disputes Act of 1978 provides a fair, balanced, and comprehensive statutory system of legal and administrative remedies in resolving Government contract claims. The act's provisions help to induce resolution of more contract disputes by negotiation prior to litigation; equalize the bargaining power of

ing to discern some general Congressional intent from isolated statements in the legislative history—at best an imprecise undertaking, at worst a highly speculative one— in order to place the Janowsky contract outside the CDA, we shall rely on the best expression of Congressional intent: the unambiguous language of section 602(a).[8] It is for Congress to amend the statute if it meant, but did not say, that some implied contracts for services entered into by executive agencies should be excluded from CDA coverage.

Since 1978, the legislature's waiver of sovereign immunity from suits based on executive agency contracts for services and property (other than real estate) has been conditioned on the contractor's submission of a claim to the agency, properly certified if the amount sought exceeds $50,000, prior to filing suit. Plaintiffs acknowledge that they have not done so.

### E

We conclude that the CDA applies to plaintiffs' claim for breach of an implied-in-fact contract. Accordingly, count I of the complaint must be dismissed for lack of jurisdiction due to plaintiffs' failure to submit a certified claim to the FBI prior to filing suit.

### III

### A

The remaining issue is whether plaintiffs state a claim for inverse condemnation. Again, the allegations of the complaint will be taken as true. Thus, we assume that Special Agent Kahoe offered to pay the Janowskys for the use of Geno's Vending in the undercover investigation, that the Janowskys accepted the offer, that the FBI

directed the operations of Geno's Vending for law enforcement purposes over a four-year period and that the Janowskys have not received payment for the use of Geno's Vending.

In order to narrow the issue, for purposes of the following discussion only we will make three additional assumptions: (i) the property interest allegedly taken is "property" within the meaning of the Just Compensation clause, *see Kimball Laundry v. United States*, 338 U.S. 1, 5–7, 69 S.Ct. 1434, 1437–38, 93 L.Ed. 1765 (1949) (taking of private laundry facilities for use of military and resulting loss of customers on established trade routes compensable under Fifth Amendment); (ii) the fact that the FBI no longer controls the business is not a bar to an inverse condemnation claim, *see First English Evangelical Lutheran Church v. Los Angeles*, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) (temporary takings are no different in kind from permanent takings); and (iii) the use of property in an undercover FBI investigation is a "public use" within the meaning of the Just Compensation clause, *cf. Shelden v. United States*, 19 Cl.Ct. 247, 253 (1990) (enforcing penal sanctions through *in personam* forfeiture is a "public use" of property under the Fifth Amendment).

■ The issue for decision, then, is whether the Janowskys' consent to the FBI's use of Geno's Vending defeats their inverse condemnation claim as a matter of law. For the reasons given below, we conclude that a property owner who voluntarily delivers property to the government pursuant to an agreement cannot later maintain an inverse condemnation claim if the government refuses to pay as agreed. If the Janowskys can recover damages for

---

the parties when a dispute exists; provide alternative forums suitable to handle the different types of disputes; and insure fair and equitable treatment to contractors and Government agencies.

Sen. Report no. 95–1118, 95th Cong., 2d Sess. 1 (1978) (*reprinted in* 1978 U.S.Code Cong. & Admin.News 5235). Applying the CDA to the Janowskys' implied contract with the FBI is entirely compatible with the enunciated purpose of the CDA.

8. " '[T]he plain, obvious and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover.' " *John C. Grimberg Co., supra,* 702 F.2d at 1368 (*quoting Chandler v. Roudebush,* 425 U.S. 840, 848, 96 S.Ct. 1949, 1953, 48 L.Ed.2d 416 (1976)).

the use of their business in the undercover investigation, recovery must be premised either on contract or on quasi-contract principles.[9]

B

Since as early as 1866, courts have deliberately avoided addressing whether a taking of private property for public use occurs when the United States uses or receives property under an agreement but refuses to pay for the property. Instead, the property owner's recovery has generally been predicated on contract principles.

In *Bogert v. United States*, 2 Ct.Cl. 159 (1866), the plaintiff sought the value of his vessel, which he alleged had been ordered sunk while it was under charter to the United States. The United States demurred to the petition and argued that the vessel had been taken under power of eminent domain (in which case the court would have lacked jurisdiction over the action under the statutes then in place). The court overruled the demurrer, stating that Bogert had "placed his vessel in the military service ... upon the faith of [a] contract, and the taking of the vessel ... while in the military service of the country ... furnishes conclusive evidence that the government ... elect[ed] to purchase [the vessel]." 2 Ct.Cl. at 164.

In *Klebe v. United States*, 57 Ct.Cl. 160 (1922), *aff'd*, 263 U.S. 188, 44 S.Ct. 58, 68 L.Ed. 244 (1923), the Klebe brothers sued for the value of a steam shovel which they said had been taken by the War Department. The Klebes had leased the steam shovel to Bates & Rogers for $25/day for use on a government job, with Bates & Rogers retaining the option to purchase the steam shovel for $5000. Any rent paid was to be credited toward the purchase price if Bates & Rogers were to exercise the purchase option. During the course of the lease, Bates & Rogers made payments totalling $4225. Then, the War Department said that it was exercising its right to purchase the steam shovel. The Klebes objected, on the apparent ground that the lease had not been formally assigned to the War Department, and later sued for the value of the steam shovel, $5000.

The court initially noted that the plaintiffs had confused situations where the government takes property under color of contract right with situations where the government takes property under its power of eminent domain. 57 Ct.Cl. at 173. Relying on *Bogert*, the court suggested that the mere showing that the government had contract rights in property was sufficient to negate an inference that the government had taken the property under its power of eminent domain. 57 Ct.Cl. at 173. Thus, the plaintiffs were entitled to the contract price of $775 ($5000 purchase price less $4225 credit for rent received). In affirming, the Supreme Court stated that if the government purports to take property pursuant to a contract but in fact it has no contract rights, then the government has committed a tort, and the court should not infer that an unconstitutional taking has occurred. 263 U.S. at 192, 44 S.Ct. at 59.

The same year that the Court of Claims decided *Klebe*, the Supreme Court decided *American Smelting v. United States*, 259 U.S. 75, 42 S.Ct. 420, 66 L.Ed. 833 (1922). During World War I, the Ordnance Department wrote to the American Smelting Company: "the Procurement Division is prepared to procure from you [approximately 60,000 pounds] ... of copper at a price of 23½ [cents] per pound.... Your acceptance of this letter is requested pending formal issuance of a contract...." 259 U.S. at 77, 42 S.Ct. at 420–21. American Smelting wrote back: "We ... take pleasure in accepting your letter...." *Id.* American Smelting promptly delivered 40,000 pounds of copper but delivery of the remaining 20,000 pounds was delayed. According to American Smelting, the delay was caused by the government's failure to

**9.** Plaintiffs' contract claim is broader than their inverse condemnation claim. The contract claim seeks damages for the FBI's breach of an agreement to pay the Janowskys for their services and for the use of their business. However, services are not "property" under the Fifth Amendment, so even if plaintiffs' inverse condemnation claim succeeded they would not recover damages for the "taking" of their services.

send shipping orders and amounted to a breach of contract.

Meanwhile the prevailing price of copper increased, and by the time American Smelting delivered the final 20,000 pounds the price had gone up to 26 cents per pound. American Smelting brought suit arguing, *inter alia,* that as to the second delivery of copper it was entitled to receive a price of 26 cents per pound rather than the agreed upon price of 23½ cents; thus, it sued for approximately $500 (approximately 20,000 pounds times 2½ cents per pound). According to American Smelting, its delivery of the final 20,000 pounds was, in effect, a government requisition under the National Defense Act, which authorized the President in time of war to requisition supplies upon payment of just compensation. The Court of Claims rejected American Smelting's argument that the second copper delivery had really been a requisition, and in a cursory opinion the Supreme Court affirmed, holding that if American Smelting had a remedy it was for breach of contract and not for just compensation under the National Defense Act. 259 U.S. at 79, 42 S.Ct. at 421.

Later cases are in accord with the *American Smelting* approach of disposing of a case on contract grounds when possible. For example, in *Sun Oil v. United States,* 215 Ct.Cl. 716, 572 F.2d 786 (1978), the court adopted a trial commissioner's recommended decision denying compensation under the Fifth Amendment for the alleged taking of certain leasehold interests held by plaintiffs (mineral leases granted by the government under the Outer Continental Shelf Lands Act). The court stated:

> [I]t is difficult to discern an intent on the part of defendant to take temporarily plaintiffs' property. The interferences with plaintiffs' lease rights were grounded on matters that ... bespoke an effort to operate within the framework of the lease and applicable regulations, not to take plaintiffs' property. If defendant's interferences were unjustified or unreasonable, plaintiffs' rights emanate from the lease agreement, not the Fifth Amendment.

215 Ct.Cl. at 770, 572 F.2d 786. *See also Winstar Corp. v. United States,* 21 Cl.Ct. 112, 117 (1990) (inverse condemnation claim stayed pending outcome of claim for breach of an implied-in-fact contract based on the same operative facts, court explicitly relying on principle that constitutional issues should be avoided when possible); *Marathon Oil Co. v. United States,* 16 Cl.Ct. 332, 338–39 (1989) (unlawful government order resulting in overpayment of oil and gas royalties to the government and lessee's concomitant loss of use of money overpaid did not give rise to an inverse condemnation claim; the parties' rights and obligations were governed by the lease agreement).

### C

While *Bogert, Klebe, American Smelting, Sun Oil, Winstar* and *Marathon Oil* express a prudential preference for avoiding constitutional issues if possible, the results in those cases can also be explained as resting on the implicit principle that a taking of private property for public use is different in kind from the government's receipt of property pursuant to an agreement with the property owner. Under this analytical distinction, when a citizen delivers property to the government pursuant to an agreement, an inverse condemnation claim does not arise simply because the government does not pay; the property owner's consent to the arrangement vitiates a claim that the government took the property for public use within the meaning of the Fifth Amendment.

This analytical distinction finds support in the common law of property. As a general matter, an action for ejectment, for replevin, or for trespass will fail if the defendant holds an easement or a license to use the plaintiff's property. The defenses of easement and license are grounded in the property owner's consent to allow his property to be used by others.

Intuitively, then, one would expect that the government could defend against an inverse condemnation action on the basis that it had the property owner's permission to use or to take property. In three cases the Court of Claims explicitly considered a

consent-based defense to an inverse condemnation claim. These cases support the drawing of a bright line between voluntary dealings between a citizen and the government involving property and government takings of property in the constitutional sense.

In *Fonalledas v. United States*, 123 Ct. Cl. 483, 107 F.Supp. 1019 (1952), the plaintiffs sought just compensation for the deleterious effects of a canal built through their property by the government. The United States argued that the plaintiffs had given permission to have the canal built. The court considered this defense but found as a matter of fact that in giving their permission the plaintiffs had expressly reserved their right to pursue a claim for just compensation. 123 Ct.Cl. at 502, 107 F.Supp. 1019.

In *National Bd. of the YMCA v. United States*, 184 Ct.Cl. 427, 396 F.2d 467 (1968), *aff'd*, 395 U.S. 85, 89 S.Ct. 1511, 23 L.Ed.2d 117 (1969), the plaintiffs sought just compensation for the alleged loss of use of parts of two of their buildings in the Panama Canal Zone; following rioting and looting, the plaintiffs had allowed the United States Army to fortify their buildings against future civil disturbances. In denying relief under the Just Compensation clause, a key fact in the court's view was that "the structural changes ... were made with the consent of the owner." 184 Ct.Cl. at 440, 396 F.2d 467.

A year later, the court again entertained a consent-based defense to an inverse condemnation claim. *J.J. Henry Co. v. United States*, 188 Ct.Cl. 39, 411 F.2d 1246 (1969). The plaintiff, a subcontractor performing design work on a Navy vessel, alleged that plans it had prepared had been taken by the Navy for use on other vessels. The court began its analysis by observing that

where the government possesses property under color of legal right, as by an express contract, there is seldom a taking in violation of the Fifth Amendment. The amendment has limited application to the relative rights in property of parties litigant which have been voluntarily created by contract.

188 Ct.Cl. at 46, 411 F.2d 1246. The court found that the plaintiff had constructive (if not actual) knowledge of a contract clause providing that all contractor-furnished plans became the property of the government and held that the plaintiff had thereby consented to the passing of title to the plans to the Navy. 188 Ct.Cl. at 47, 411 F.2d 1246. Although not fully explicated, *Fonalledas*, *YMCA* and *J.J. Henry* suggest that there is an analytical distinction between the government's use of property pursuant to an agreement and the government's taking of property by coercion.

In the related realm of so-called regulatory takings, a court should take into account, *inter alia*, the character of the government action. *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). Similarly, when the plaintiff in an inverse condemnation action alleges that he had an agreement with the government pertaining to property which the government received but did not pay for, it is appropriate to focus on the character of the government action. *YMCA* and *J.J. Henry* took just such an approach. If the government action was not coercive, the government has not "taken" property but rather there has been a bargained-for exchange. Simply put, the Fifth Amendment was not meant to protect property owners in their voluntary dealings with the government. *See Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960) (the purpose of forbidding uncompensated takings of private property for public use is "to bar Government from *forcing* some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole") (emphasis added).

## D

Apart from the cases discussed above—where contract principles rather than constitutional principles governed the rights in property voluntarily delivered to the government—another line of cases recognizes that under some circumstances a property owner cannot recover for breach

of contract when the government refuses to pay for property delivered pursuant to an agreement. For example, a contract is voidable at the option of the government when the official who made the agreement lacked actual authority to bind the government. *See Empresas Electronics Walser, Inc. v. United States,* 223 Ct.Cl. 686, 688, 650 F.2d 286, *cert. denied,* 449 U.S. 953, 101 S.Ct. 357, 66 L.Ed.2d 217 (1980) (an agency "can disavow" the unauthorized promises of its agents); Rest. (2d) Contracts, § 7 (a principal is free to affirm or to disavow the unauthorized promises of its agent, and thus contracts entered into by the agent acting beyond the scope of his authority are not void but are voidable by the principal). If an agency enters into a procurement contract in clear violation of statute or regulation, the contract is void. *United States v. Amdahl Corp.,* 786 F.2d 387, 393 (Fed.Cir.1986). A court cannot award damages for breach of a void contract, nor can it award damages for breach of a voidable contract if the party with the power to avoid the agreement disavows the agreement. However, even in cases where property has been delivered to the government, the government does not pay as agreed and damages for breach of contract are unavailable, courts have avoided awarding just compensation and have instead based relief on quasi-contract theories.

In *Wheeler v. United States,* 5 Ct.Cl. 504 (1869), Wheeler agreed to deliver firewood to the Army. Wheeler verbally assigned the contract to Gill; Gill delivered the firewood which was accepted and used by the Army. When the Army failed to pay the entire contract price, Gill sued in Wheeler's name for the balance. The court ruled that by statute (an early version of the Anti–Assignment Act), the assignment from Wheeler to Gill rendered the contract void. However, the court did award damages under a *quantum meruit* rationale for the value of the wood received and used.

A similar result was reached in *Clark v. United States,* 95 U.S. (5 Otto) 539, 24 L.Ed. 518 (1877). There, a shipowner alleged that the War Department had breached an oral contract of charter. The court found that the contract itself was void but awarded the shipowner the value of the use of his vessel during the time it was in the hands of government agents under a *quantum meruit* theory.

*Wheeler* and *Clark* are vital today. In *Urban Data Systems v. United States,* 699 F.2d 1147 (Fed.Cir.1983), the court affirmed a finding that the price terms in a computer paper vendor's subcontract, which subcontract had been performed, were void as contrary to statute. However, the court also held that notwithstanding the illegal price mechanism, Urban Data Systems was "entitled to reimbursement on a *quantum valebant* basis for the reasonable value in the marketplace of the supplies and concomitant services [furnished]." 699 F.2d at 1154.

Four years later, in *United States v. Amdahl Corp.,* 786 F.2d 387, 393 (Fed.Cir. 1986), the court reaffirmed the principle that in certain limited fact situations, "relief of a quasi-contractual nature" could be granted in a suit against the United States. Summarizing the precedent, the court stated that "where goods or services have been delivered by a contractor and accepted by the government, ... the contractor is entitled to payment ... on a *quantum valebant* or *quantum meruit* basis if the contract is *void ab initio.*" 786 F.2d at 395. The court went on to say that the contractor is entitled "to a possibly larger amount if the contract is voidable." *Id. See also Ocean Technology v. United States,* 19 Cl.Ct. 288, 294 (1990) (" ' "[e]ven though a contract be unenforceable against the government ... it is only fair ... that the government pay for goods delivered or services rendered.... The basic fact of legal significance ... is [the government's] retention of benefits in the form of goods or services ..." ' ") (*quoting United States v. Amdahl Corp., supra,* 786 F.2d at 393 (*quoting Prestex v. United States,* 162 Ct. Cl. 620, 628, 320 F.2d 367 (1963))).[10]

---

10. The Court of Claims also recognized that even if a government official lacks actual authority to bind the United States by his promise, knowing acceptance of benefits by those em-

Even after *Office of Personnel Management v. Richmond,* —— U.S. ——, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990), the line of cases culminating in *Amdahl* is still good law. In *Richmond,* the court held that a retired Navy employee could not recover for the temporary loss of his disability annuity occasioned by his reliance on erroneous written advice from a Navy official. The court held that because payments from the federal treasury can only be made pursuant to Congressional authorization, and because to grant the relief Richmond sought would be tantamount to ordering a payment that was contrary to statute and therefore without Congressional authorization, recovery was barred by the Appropriations Clause. 110 S.Ct. at 2474. Thus, detrimental reliance, or estoppel, can never form the basis for a money claim against the government. *Id.* at 2476.

In contrast, the *Amdahl* line recognizes relief under a rare species of "implied-in-fact contract." *See Amdahl,* 786 F.2d at 393. *Richmond* is also distinguishable from the *quantum meruit* cases, for in *Richmond* there was no benefit conferred on the government. Finally, we doubt that the Court in *Richmond* meant to overrule *sub silentio* its 110–year–old precedent in *Clark.*

The significance of the *Amdahl* line is that the Federal Circuit, when confronted with a plaintiff alleging that he voluntarily delivered property to the government and that the government refused to pay the agreed-upon price, once again steered clear of the Fifth Amendment's Just Compensation Clause, even though damages for breach of contract were unavailable. It is also interesting to note that a *quantum meruit* award is calculated in the same way that just compensation is calculated. Under *quantum meruit,* the (quasi-)contractor recovers the value in the marketplace of the supplies delivered to and accepted by the government. *Urban Data Systems, supra,* 699 F.2d at 1155. Likewise, in a successful inverse condemnation action, the plaintiff recovers the fair market value of the property taken. *Whitney Benefits v. United States,* 926 F.2d 1169, 1178 (Fed.Cir.1991). Thus, a property owner recovering *quantum meruit* for the government's use of his property cannot argue that the compensation he receives is not just. Indeed, a contractor can recover an amount "possibly larger" than *quantum meruit* if the contract is voidable rather than void. *Amdahl,* 786 F.2d at 395.

### E

■ Under the facts alleged, the Janowskys do not state a claim for inverse condemnation. The cases discussed in part III C suggest that there is never a taking of private property for public use within the meaning of the Fifth Amendment when the property owner agrees to allow his property to be used by the government.[11] If the plaintiff and the government have a contract, then all rights and remedies pertain-

---

powered to bind the government can result in ratification of the unauthorized official's promise. *Silverman v. United States,* 230 Ct.Cl. 701, 679 F.2d 865 (1982); *Philadelphia Suburban Corp. v. United States,* 217 Ct.Cl. 705 (1978); *New York Mail and Newspaper v. United States,* 139 Ct.Cl. 751, 154 F.Supp. 271, *cert. denied,* 355 U.S. 904, 78 S.Ct. 332, 2 L.Ed.2d 260 (1957). *See generally H. Landau & Co. v. United States,* 886 F.2d 322 (Fed.Cir.1989) (a government official may be deemed to have had "implied actual authority" to bind the government by his promise). *But see City of El Centro v. United States,* 922 F.2d 816, 821 (Fed.Cir.1990) (government agency held not to have ratified the unauthorized promise of its agent by knowing acceptance of benefits because "there was no promise, certainly no express promise, by an official empowered to bind the Government to pay for the [services] rendered").

11. Nothing in Part III should be construed to mean that a necessary element of an inverse condemnation claim is the allegation that the property owner was coerced by the government. Just as "[i]n *defending* [against an inverse condemnation claim], the government may deny [the] authority [of its agents] and in that way authority *could* become an issue," *Florida Rock Industries, Inc. v. United States,* 791 F.2d 893, 899 (Fed.Cir.1986) (emphasis added), consent will normally become an issue in an inverse condemnation claim only when raised by the government in defending. Here, however, the government should not be required to prove that the Janowskys consented to having their business used in the investigation because the Janowskys make that very allegation in their complaint.

ing to the subject matter of the contract should be governed by contract principles.

## IV

In light of the foregoing, count I of the complaint is DISMISSED for lack of jurisdiction, and count II of the complaint is DISMISSED for failure to state a claim upon which relief can be granted. Judgment shall be entered accordingly.

Each party shall bear its own costs.