A05A0262. McELMURRAY et al. v. AUGUSTA-RICHMOND
COUNTY.
(618 SE2d 59)

PHIPPS, Judge.

Through their family corporation, the McElmurrays own and operate a dairy and crop farming business in Richmond County. In February 2001, they brought this suit against Augusta-Richmond County, successor by consolidation to the City of Augusta, complaining that from 1979 until 1990 they had permitted the city to use their farm land as a disposal site for sewage sludge generated at the city's Messerly wastewater treatment plant based on misrepresentations by the city that the sludge constituted a safe and beneficial fertilizer. The McElmurrays claim that the sludge contained metals and toxic constituents at concentrations high enough to be classified as hazardous waste in violation of state and federal environmental laws, and that application of the sludge damaged their crop lands and killed their cows.

In their multicount complaint, the McElmurrays sought recovery of damages on theories of inverse condemnation, breach of contract, fraud, strict tort liability, negligence, products liability,

nuisance, trespass, conversion, and violation of the Georgia Hazardous Site Response Act (HSRA).[1] The trial court dismissed the inverse condemnation count for failure to state a claim for relief, awarded summary judgment to Augusta-Richmond County on the breach of contract count, and dismissed the remaining counts on the ground of sovereign immunity. For reasons which follow, we affirm in part and reverse in part.

In the late 1970s, the city developed a land application program as a means of disposing of sewage sludge from the Messerly treatment plant onto private farm land. The city contacted farmers, including the McElmurrays, to promote application of sewage sludge as a fertilizer. Beginning in 1979, the McElmurrays entered into a series of agreements under which they granted the city temporary licenses and easements for the spreading of sewage sludge upon described tracts of land. The city applied millions of gallons of sewage sludge on certain of the McElmurrays' fields beginning in 1979. Under the agreements, the city agreed to monitor sludge applications by testing the sludge for heavy metals and other constituents on a monthly basis and by recording the amount of sludge and levels of constituents applied to each field. In the late 1980s, the McElmurrays began experiencing significant problems with crop growth and production on their lands. Also, the McElmurrays' dairy cattle developed an immune system deficiency and, according to the McElmurrays, began dying in excessive numbers. As a result, the McElmurrays ceased participation in the land application program in 1990.

In their complaint, the McElmurrays alleged that from reviewing documents produced by the city in 1998 and 1999 during the pendency of federal litigation between the parties, they discovered that the city had concealed high concentrations of metals in sludge applications, and had misrepresented the quantity and quality of sludge applied to their lands in reports to them and to state environmental authorities. The McElmurrays further alleged that the city had let the sewage sludge become contaminated by allowing industrial wastes to be dumped into the sewer system.

In September 2001, the court entered an order dismissing the McElmurrays' claims against the city for inverse condemnation and for the various torts. As to the McElmurrays' inverse condemnation claim, the trial court was persuaded by the decision of the United States Claims Court in *Janowsky v. United States*,[2] and by a comparison of Supreme Court of Georgia and Court of Appeals' decisions

---

[1] OCGA § 12-8-90 et seq.

[2] 23 Cl. Ct. 706 (1991), rev'd in part on other grounds by unpublished op. at 989 F2d 1203 (1993 U. S. App. LEXIS 3617) (Fed. Cir. 1993).

in *Knight v. Dept. of Transp.*[3] and *Bray v. Houston County*[4] with the Georgia Court of Appeals' decision in *Shealy v. Unified Govt. of Athens-Clarke County*,[5] that an inverse condemnation claim does not lie where, as here, a property owner consents to the action of the government that resulted in the alleged taking or damaging of the property.

The trial court ruled that the McElmurrays' tort claims are barred by the doctrine of sovereign immunity. In so ruling, the court rejected the McElmurrays' argument that the city had waived sovereign immunity under OCGA § 33-24-51 by purchasing liability insurance arising from its use or operation of the motor vehicles used to apply the sewage sludge to the McElmurrays' lands. Finding this case more analogous to *Harry v. Glynn County*[6] and *Saylor v. Troup County*[7] (the cases relied on by Augusta-Richmond County), than to *Mitchell v. City of St. Marys*[8] and *Crider v. Zurich Ins. Co.*[9] (the cases relied on by the McElmurrays), the court concluded that any damages to the McElmurrays' lands by application of the sewage sludge had not arisen from motor vehicle use by the city. In reliance on *Donaldson v. Dept. of Transp.*,[10] *Bontwell v. Dept. of Corrections*,[11] and *Dept. of Corrections v. Lamaine*,[12] the court also found this action to be barred by sovereign immunity because it was not filed until after the effective date of the 1991 state constitutional amendment eliminating the insurance waiver of sovereign immunity.

By order entered in January 2002, the trial court dismissed the McElmurrays' claim under the Georgia HSRA on the ground that the HSRA does not provide for a waiver of sovereign immunity. And the court awarded summary judgment to the county on the McElmurrays' breach of contract claim by order entered in February 2004, finding that this claim is barred by the applicable statute of limitation and by an indemnification and hold harmless clause in the parties' agreements; that the evidence is insufficient, as a matter of law, to establish the requisite causation between the city's alleged breaches

---

[3] 239 Ga. 368 (236 SE2d 826) (1977).

[4] 180 Ga. App. 166 (348 SE2d 709) (1986).

[5] 244 Ga. App. 853 (537 SE2d 105) (2000).

[6] 269 Ga. 503 (501 SE2d 196) (1998).

[7] 225 Ga. App. 489 (484 SE2d 298) (1997).

[8] 155 Ga. App. 642 (271 SE2d 895) (1980).

[9] 222 Ga. App. 177 (474 SE2d 89) (1996).

[10] 262 Ga. 49 (414 SE2d 638) (1992).

[11] 226 Ga. App. 524 (486 SE2d 917) (1997) (physical precedent only).

[12] 233 Ga. App. 271 (502 SE2d 766) (1998).

of contract and the McElmurrays' injuries and damages; and that the McElmurrays' damage calculations are too speculative to support a recovery.

1. The McElmurrays contend that the trial court erred in dismissing their inverse condemnation claim. There is no merit in this contention.

In *Janowsky*, the United States Claims Court, in reliance on a long line of federal precedent, sanctioned "the drawing of a bright line between voluntary dealings between a citizen and the government involving property and government takings of property in the constitutional sense."[13] "Simply put,"[14] the court concluded that that part of the Fifth Amendment prohibiting the taking of private property for public use without just compensation "was not meant to protect property owners in their voluntary dealings with the government."[15] *Janowsky* broadly held that

> there is never a taking of private property for public use within the meaning of the Fifth Amendment when the property owner agrees to allow his property to be used by the government. If the plaintiff and the government have a contract, then all rights and remedies pertaining to the subject matter of the contract should be governed by contract principles.[16]

Georgia law is in accord. In *Barwick v. Roberts*,[17] the plaintiff filed a petition alleging that he had leased property from certain landowners for the purpose of developing a farmer's market and then assigned the leases to the Georgia commissioner of agriculture, while retaining title to any improvements made on the property. The plaintiff complained that the commissioner's successor had deprived him of his rights in the improvements. Our Supreme Court held that,

> the petition does not disclose that any of the plaintiff's property has been wrongfully and forcibly taken from him, and in like manner seized and occupied by any of the defendants, but on the contrary that the entry was by his express consent; and for this reason, if for none other, no case is made for application . . . of . . . the provision found in art. 1, sec. 3, par. 1, of the Georgia constitution . . . , which

---

[13] 23 Cl. Ct. at 714.
[14] Id.
[15] Id. (citation omitted).
[16] Id. at 716-717 (footnote omitted).
[17] 192 Ga. 783 (16 SE2d 867) (1941).

declares that "Private property shall not be taken, or damaged, for public purposes, without just and adequate compensation being paid first."[18]

The rule announced in *Roberts* was followed in *Bray*.[19] In *Shealy*,[20] we did recognize that an inverse condemnation action may be brought against a county for contamination to property caused by the escape of toxic or hazardous substances from a landfill if the contamination amounted to the taking of property without just compensation. But in *Shealy*, unlike the present case, the property owners had not consented to the defendant's release of the substances onto their property. Where, as here, the property owners have consented to the government action, a suit for inverse condemnation does not provide them with a remedy. The court did not err in dismissing that count of the McElmurrays' complaint.[21]

2. The McElmurrays contend that the trial court erred in dismissing their tort claims on the ground of sovereign immunity. We agree.

(a) Under a local Act of the General Assembly, the consolidated government of Augusta-Richmond County is to be treated as a county for tort liability purposes.[22] Both our Supreme Court and this court have recognized the validity of legislative enactments such as this.[23] A county is not liable to suit for any cause of action unless made so by statute.[24] As enacted in 1983, Article I, Section II, Paragraph IX of the Georgia Constitution waived sovereign immunity in actions for the recovery of damages against the state or any of its departments and agencies to the extent that liability insurance was provided.[25] *Toombs County v. O'Neal*[26] held that, for purposes of the above-cited constitutional provision, a county was included within the definition of "the [s]tate or any of its departments and agencies."[27] But in 1991 this constitutional provision was amended to delete the "insurance waiver" clause and provide instead that the "General Assembly may waive the state's sovereign immunity from suit by enacting a State Tort

---

[18] Id. at 783-784 (8).

[19] *Bray*, supra at 168; accord *Knight*, supra at 371 (4).

[20] Supra.

[21] See generally *Anderson v. Flake*, 267 Ga. 498, 501 (2) (480 SE2d 10) (1997).

[22] Ga. L. 1996, p. 3607.

[23] See *Bowen v. Columbus*, 256 Ga. 462 (349 SE2d 740) (1986); *Swan v. Johnson*, 219 Ga. App. 450, 452 (3) (465 SE2d 684) (1995).

[24] See *Butler v. Gwinnett County*, 223 Ga. App. 703, 705 (2) (479 SE2d 11) (1996), citing OCGA § 36-1-4.

[25] *Price v. Dept. of Transp.*, 257 Ga. 535, 536 (361 SE2d 146) (1987).

[26] 254 Ga. 390 (330 SE2d 95) (1985).

[27] Id. at 392 (2).

Claims Act."[28] In *Gilbert v. Richardson*,[29] our Supreme Court held that sovereign immunity extends to counties under the 1991 constitutional amendment.[30] But the Court in *Gilbert* also rejected the argument that under the 1991 amendment, the Tort Claims Act is the only means by which the legislature is authorized to waive immunity.[31] Considering the 1991 amendment as a whole, the Court in *Gilbert* held that "sovereign immunity is waived by any legislative act which specifically provides that sovereign immunity is waived and the extent of such waiver."[32]

OCGA § 33-24-51 (a) authorizes a municipal corporation, a county, or any other political subdivision of this state to secure insurance to cover liability for damages "arising by reason of ownership, maintenance, operation, or use of any motor vehicle." It follows that OCGA § 33-24-51 (b) is a statute under which the General Assembly has expressly provided for a waiver of governmental immunity of local governmental entities to the extent of liability insurance purchased for tort claims arising out of the alleged negligent use of a motor vehicle.[33]

Consequently, the trial court erred in holding, in reliance on *Donaldson, Bontwell,* and *Lamaine,* that this action is barred by sovereign immunity because it was not filed until after the effective date of the 1991 constitutional amendment. *Donaldson* was a negligence action filed against the Department of Transportation. *Bontwell* and *Lamaine* were wrongful death actions against the Department of Corrections and other defendants. None of those cases involved a waiver of sovereign immunity under OCGA § 33-24-51. Moreover, although *Donaldson* reasoned that "the state may withdraw its waiver of sovereign immunity at any time before a citizen acts in reliance on that waiver by filing suit,"[34] our Supreme Court in *Curtis* later held that, where the cause of action accrued before the effective date of the 1991 amendment, withdrawal of the waiver of sovereign immunity "remains effective regardless of whether the action was filed before or after the effective date of the amendment."[35] Therefore,

---

[28] *Curtis v. Bd. of Regents &c. of Ga.*, 262 Ga. 226, 227 (416 SE2d 510) (1992) (punctuation omitted).

[29] 264 Ga. 744 (452 SE2d 476) (1994).

[30] Id. at 746-747 (2).

[31] Id. at 747-748 (3).

[32] Id. at 748.

[33] See *CSX Transp. v. City of Garden City*, 277 Ga. 248, 250, n. 3 (588 SE2d 688) (2003).

[34] *Donaldson*, supra at 53 (3).

[35] *Curtis*, supra at 228.

*Donaldson* is both distinguishable from this case and (contrary to *Bontwell* and *Lamaine*) would appear to be no longer controlling in light of *Curtis*.

(b) We must therefore address the correctness of the trial court's ruling that any damage to the McElmurrays' lands by application of the sewage sludge would not be covered by liability insurance because it would not have arisen from motor vehicle use by the city within the meaning of any liability insurance policy. In so ruling, the trial court found *Harry* and *Saylor* controlling and distinguished *Mitchell* and *Crider*.

In *Mitchell*, an employee of the City of St. Marys was operating a truck containing an insect fogger device when he sprayed the plaintiff with a highly poisonous and toxic chemical resulting in her total disability. The question was whether the city had waived its governmental immunity under OCGA § 33-24-51. The city urged that the plaintiff's injury, alleged to be the result of spraying from the truck rather than the result of a more direct contact with the truck in its capacity as a "motor vehicle," was not such an activity contemplated by the statute. We found this argument unpersuasive, reasoning:

> Whether or not an injury arose from the "use" of a motor vehicle within the contemplation of a liability policy or statute depends upon the factual context of each case. In this setting the term does not imply "remoteness," but does extend beyond actual physical contact. And it would seem to extend at least to the point, beyond physical contact, where control over the instrumentality is easily or reasonably at hand, and particularly when it is still being "utilized." It follows that where a truck is being used for mosquito eradication, damages resulting from the spraying of insecticide from that truck are injuries arising by reason of the "use" of that truck.[36]

---

[36] *Mitchell*, supra at 645 (2) (citation and punctuation omitted).

The dissent seeks to distinguish *Mitchell* and asserts that,

[t]he damages claimed by the McElmurrays as a result of this sludge have no relation to the manner in which the sludge was applied to the land and did not occur during the spreading of the sludge. This case did not arise because Augusta-Richmond County spread the sludge. The claimed injuries would exist regardless of what means were used to spread the sludge.

To the contrary, the McElmurrays complain of the contamination of and damage to their land, as well as to their crops and dairy farm business. The land would have been contaminated when the sewage sludge was applied. That distinguishes *City of Rossville v. Britton*, 170 Ga. App. 1, 1-3 (2) (316 SE2d 16) (1984), cited and discussed by the dissent. It is true that the damages claimed by the McElmurrays as a result of the sludge have no relation to the manner in which the sludge was applied and would exist regardless of what means were used to spread the

The plaintiff in *Crider* was an inmate in a county detention center. While trimming trees in the bucket of a backhoe, he was thrown to the ground and severely injured. He filed a negligence action against the county, which had liability insurance that had coverage specifically applicable to vehicles such as a backhoe. The question was whether the backhoe could be considered a motor vehicle within the meaning of OCGA § 33-24-51. We held that it could.[37]

The plaintiff in *Saylor* was injured while working as an inmate on a prison work detail. At the time of the incident, he was sharpening a swing blade on a vise attached to the bumper of a van for which the county had obtained liability insurance. After being bumped by a tractor, Saylor lost his balance and fell across the swing blade. He brought a negligence action against the county. The trial court granted the county's motion for summary judgment based on its defense of sovereign immunity, on the ground that its liability insurance policy did not cover the incident. We affirmed. We held that the question to be answered was whether the injury originated from, had its origin in, grew out of, or flowed from the use of the motor vehicle as a vehicle. We answered this question in the negative, because when the tractor bumped Saylor, the van was inoperative, parked off the roadway while its engine was not engaged. Saylor was merely using the bumper of the van for placement of the vise.

In *Harry*, the plaintiff's wife died as a result of the alleged negligence of a paramedic who provided emergency aid for her in an ambulance while she was being transported to a hospital. Plaintiff sued the paramedic and the county who employed him, charging the paramedic with negligence in misdiagnosing the decedent's condition and in failing to use defibrillation. Plaintiff contended that the county had waived its sovereign immunity because the negligence of the paramedic had occurred while his wife was being transported in an ambulance. Our Supreme Court disagreed, holding that the allegedly negligent acts did not involve the use of the ambulance.[38]

This case is controlled by *Mitchell*. There, the city was using a motor vehicle to spray a toxic chemical. The McElmurrays allege that the city was using motor vehicles to spread toxic waste. These facts are legally indistinguishable from those in *Mitchell*. The facts in

---

sludge. But that too was the situation in *Mitchell*. In attempting to distinguish *Mitchell*, the dissent overlooks its conclusion "that where a truck is being used for mosquito eradication, damages resulting from the spraying of insecticide from that truck are injuries arising by reason of the 'use' of that truck." Id. It follows that where a truck is being used for spreading sewage sludge, damages resulting from the spreading of the sludge from the truck are injuries arising by reason of use of the truck.

[37] *Crider*, supra at 177-180 (2).

[38] *Harry*, supra at 503-504 (1).

*Saylor* and *Harry* are readily distinguishable. The plaintiff in *Saylor* was injured by a swing blade that he was sharpening on a vise that was attached to a parked van. Although the van was a motor vehicle, it was not being used as such at the time of the incident. In *Harry*, a paramedic was charged with negligent treatment. The alleged negligence occurred while the paramedic was in an ambulance, but was in no way connected to operation of the ambulance. In contrast, the allegation here is that motor vehicles were being used to spread the sludge on plaintiffs' lands. The trial court thus erred in dismissing the McElmurrays' tort claims on the ground that liability insurance for motor vehicle use would not be applicable.

3. The McElmurrays contend that the trial court erred in dismissing their claim for violation of the HSRA.

Pursuant to the 1991 amendment to Art. I, Sec. II, Par. IX of the Georgia Constitution, "the defense of sovereign immunity to tort liability . . . can only be waived pursuant to a 'legislative act which specifically provides that sovereign immunity is waived and the extent of such waiver.' [Cit.]"[39]

The Georgia HSRA declares it to be the public policy of this state "to require corrective action for releases of hazardous wastes, hazardous constituents, and hazardous substances . . . into the environment that may pose a threat to human health or the environment. . . ."[40] To this end, the Act provides that whenever the director of the Environmental Protection Division of the Department of Natural Resources has reason to believe there has been a release of hazardous wastes or substances posing a danger to health or the environment, the director shall make a reasonable effort to identify each person contributing to the release and order such person to take corrective action if he does not agree to do so voluntarily.[41] The Act makes each person contributing to the release "jointly, severally, and strictly liable to the State of Georgia for the reasonable costs of activities associated with the cleanup of environmental hazards."[42] And during or following the undertaking of any corrective action, each such person may seek contribution from any other person who has contributed or is contributing to the release.[43] Clearly, this Act provides an administrative environmental-cleanup procedure and does not expressly waive sovereign immunity for any allegedly responsible governmental entity. Therefore, the trial court did not err in dismissing the McElmurrays' claim under the HSRA.

---

[39] *Woodard v. Laurens County*, 265 Ga. 404, 405 (1) (456 SE2d 581) (1995).
[40] OCGA § 12-8-91 (a).
[41] OCGA § 12-8-96 (a).
[42] OCGA § 12-8-96.1 (a).
[43] OCGA § 12-8-96.1 (e).

4. The McElmurrays contend that the trial court erred in awarding summary judgment to Augusta-Richmond County on their breach of contract claim.

> "To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law."[44]

"On summary judgment it is inappropriate for this Court to weigh evidence or determine its credibility. Where the facts, as testified to by the parties, create a conflict in the evidence as to a material issue, summary judgment is precluded. [Cit.]"[45] "Nevertheless, a plaintiff may not survive a defendant's motion for summary judgment under OCGA § 9-11-56 if there is no evidence in the record 'sufficient to create a genuine issue as to any essential element of plaintiff's claim.' [Cit.]"[46]

(a) The trial court ruled that the McElmurrays' breach of contract claim is governed by the four-year statute of limitation applicable to contracts that are partly oral and partly written;[47] that this statute begins to run from the time the contract is breached;[48] and that the statute has, therefore, run because it is undisputed that the city did not commit any breach of contract after making its last applications of sewage sludge to the McElmurrays' lands in 1990, and the McElmurrays did not bring this suit until 2001.

In awarding summary judgment to Augusta-Richmond County on the McElmurrays' breach of contract claim, the trial court also rejected the McElmurrays' charge that the city committed fraud tolling the running of the statute of limitation under OCGA § 9-3-96. That statute provides: "If the defendant or those under whom he claims are guilty of a fraud by which the plaintiff has been debarred or deterred from bringing an action, the period of limitation shall run only from the time of the plaintiff's discovery of the fraud."

> However, "the fraud in question is not that which gives a cause of action, but that which conceals a cause of action.

---

[44] *English v. Fulton County Bldg. Auth.*, 266 Ga. App. 583 (597 SE2d 626) (2004) (footnote omitted).

[45] *Bearden v. Bearden*, 231 Ga. App. 182, 184 (499 SE2d 359) (1998).

[46] *Motorola v. Ward*, 223 Ga. App. 678 (478 SE2d 465) (1996) (physical precedent only).

[47] See *Jankowski v. Taylor, Bishop & Lee*, 154 Ga. App. 752, 754-755 (2), (3) (269 SE2d 871) (1980); OCGA § 9-3-25.

[48] *R. L. Sanders Roofing Co. v. Miller*, 153 Ga. App. 225, 226 (1) (264 SE2d 731) (1980).

To constitute concealment of a cause of action so as to prevent the running of limitations, some trick or artifice must be employed to prevent inquiry or elude investigation, or to mislead and hinder the party who has the cause of action from obtaining information, and the acts relied on must be of an affirmative character and fraudulent. [Cit.]"[49]

In support of their claim that the city fraudulently concealed the existence of their cause of action from them, the McElmurrays rely on evidence that the city knew from analyses conducted in the early 1980s that the sludge being applied to their lands contained unlawfully high concentrations of metals and toxic constituents; that the city nonetheless terminated its analyzing activity for such constituents and never informed them of the true composition of the sludge or of its hazardous nature; that the city had a duty under the parties' license/easement agreements and under state and federal regulatory laws to monitor, and to keep accurate records of, the volumes of sludge and to report all such information to them; that the city had admitted in its answers to interrogatories in the federal litigation that it had not done so; that field update reports and summaries provided by the city were false and misleading; and that all of this did not become apparent to them until the records of sludge applications were compared to spreadsheets first created by the city in the federal litigation in 1998 and 1999.

But even assuming all of this to be true, it appears without contradiction from the record that although the parties' agreements imposed on the city a duty to provide the McElmurrays with a chemical analysis of the digested sewage sludge monthly and to monitor heavy metals in the sludge to prevent harmful buildup, the agreements also imposed on the McElmurrays a duty to have the soil tested annually to show concentration of most of the same constituents the city testing was required to show.

In order to establish fraudulent concealment under OCGA § 9-3-96 sufficient to toll the statute of limitation, a plaintiff must prove that: (1) the defendant committed actual fraud involving moral turpitude, (2) the fraud concealed the cause of action from the plaintiff, and (3) the plaintiff exercised reasonable diligence to discover his cause of action despite his failure to do so within the applicable statute of limitation. [Cit.][50]

---

[49] *Costrini v. Hansen Architects*, 247 Ga. App. 136, 138 (2) (543 SE2d 760) (2000).
[50] *Wilson v. Phillips*, 230 Ga. App. 290 (495 SE2d 904) (1998).

Because the McElmurrays were also under a duty to test the soil for the presence of hazardous substances of which they complain, they cannot show that they exercised reasonable diligence in relying on any misrepresentations by the city as to the presence of such substances. For this reason alone, the evidence fails to establish at least one of the essential elements of the McElmurrays' claim of fraudulent concealment. Accordingly, the court did not err in awarding summary judgment to Augusta-Richmond County on the question of whether the statute of limitation has run on the McElmurrays' breach of contract claim.

(b) The trial court also found insufficient evidence to support the McElmurrays' theory that feeding dairy cattle with crops fertilized by hazardous wastes can result in an immune system deficiency. (We address this issue and others relating to the McElmurrays' breach of contract claim insofar as they are relevant to issues concerning the recoverability of damages for their tort claims.)

In support of the finding under review, the trial court noted that the McElmurrays' experts had been unable to identify a single scientific study supporting their theory; that cows with similar findings in regard to heavy metals in their tissues did not have adverse health effects; that in the necroscopies that were performed, cow diseases such as Johne's disease, that occur on all dairy farms, were found to be the contributing cause of death; that none of the necroscopy reports found that any of the cows died as a result of any heavy metal buildup in their tissues; that the major clinical signs of Johne's disease, i.e., diarrhea and wasting away, are the major symptoms exhibited by the McElmurrays' cows; and that analysis of blood samples taken from cows on dairy farms that did not receive sewage sludge revealed concentrations of heavy metals comparable to those found in the McElmurrays' cows.

The court also noted that the vast majority of soil samples, and crop and cow tissue analyses, were taken or performed in 1998, eight years after the last sludge was applied to the McElmurrays' fields. During the intervening time period, the McElmurrays applied commercial fertilizer to their farm land. Moreover, the crops grown on the McElmurrays' sludge-treated fields constituted less than 40 percent of the feed in their cows' diets. Feed from outside sources contained mineral supplementation. Finally, the court found that the McElmurrays could not identify "exceedances" of any metals claimed to harm their cows and that "exceedances," in any event, do not mean that the land has been damaged or cannot be used safely to grow crops for cow feed.

Based on the parties' citations to the record, we find the superior court's award of summary judgment to Augusta-Richmond County on causation issues unsupportable for the following reasons:

On the question of whether excessive metals were found in the soil, the McElmurrays have pointed to evidence in the record from which a jury could find that, in those fields from which soil samples were taken, there were unquestionably concentrations of at least some of the metals at issue exceeding state and federal regulatory limits at levels so high as to classify the tested soil as containing hazardous wastes. Specifically, one of the McElmurrays' experts identified findings of cadmium in the soil of various fields at concentrations well in excess of that which has resulted in federal cleanup orders in prior reported cases. Another expert verified that excessive levels of one or more of the metals in the McElmurrays' crop lands had been confirmed by extensive testing.

On the question of whether the excessive level of metals in the soil was caused by the sludge applications, plaintiffs' experts explained that they did not examine commercial fertilizers as a potential source of contamination because there have been no reported findings of damaging levels of heavy metals in commercial fertilizers; and that background concentrations of heavy metals in commercial fertilizers as well as animal mineral supplements have remained at low and consistent levels through the years. Moreover, one of the experts noted that all dairy farms in surrounding areas were purchasing commercial fertilizers and feed supplements from the same suppliers, yet the severe health and production problems associated with the McElmurray farm and one other (that also received the sludge applications) "stand out alone." The conclusion, therefore, was that the only avenue for heavy metal introduction was the sludge applications.

On the question of whether an excessive level of metals in the soil could have been transferred to the crops which were fed to the cows, one of the McElmurrays' experts noted that textbooks dating back almost 50 years have described a condition in cattle termed alkali disease or blind staggers, which is a selenium toxicity resulting from consumption of forages produced from selenium-toxic soils or from soils with proper conditions to accelerate the plant uptake of selenium. This expert further testified that peer-reviewed scientific studies do exist, but for other classes of cattle that are of relatively no use in regard to dairy cattle, and that the absence of such studies concerning dairy cattle is attributable to the high cost of investigating such a complex field of study.

On the question of whether there were excessive concentrations of metals in the McElmurrays' cows' tissues, the McElmurrays assert without contradiction that there is undisputed evidence that, at a minimum, toxically high levels of copper were found in tissue samples taken from their herd. One of their experts identified a report confirming accumulations of zinc, copper, and cadmium in liver and

kidney tissues of McElmurrays' cows in levels high enough to be considered toxic. According to this expert, the findings of metals present in the tissues of other cows were not comparable to those for the McElmurray herd.

On the question of whether an excessive concentration of metals in the cows' tissues could have caused an immune system deficiency, one of the McElmurrays' experts testified that it is his view, and the consensus of pathologists, that toxic levels of metals negatively impact the liver's ability to carry out more than 1,500 biochemical functions. Another expert noted that an unusually high concentration of iron, zinc, manganese, copper, cobalt, molybdenum, and other heavy metals reduces the effectiveness of a key set of bovine enzymes known as metalloenzymes and results in a loss of metabolic function. This expert identified a number of scientific sources corroborating this view. And although none of the necroscopies or histological examinations performed on the McElmurrays' cows affirmatively identified any heavy metal toxicity as a cause of the cows' deaths, the pathology reports did not positively identify any specific, exclusive cause of death because concentrations of heavy metals concurrent with other conditions could not be ruled out as a contributing cause.

On the question of whether the increased morbidity and mortality rates in the McElmurrays' cows was caused by Johne's Disease, one of the McElmurrays' experts explained that he eliminated it as the cause of the health problems because the specific symptoms caused by that disease (e.g., persistent, progressive, profuse and watery diarrhea, usually over a three-year period, almost always triggered by calving, with the cows losing weight and eventually dying while their appetites remain normal and the cows usually remain alert) were not present in the McElmurray herd.

Ultimately, the McElmurrays' theory that the excessive concentration of metals in their cows' tissues resulted in increased morbidity and mortality rates for their herd rested on a consideration of the foregoing evidence in conjunction with the elimination of other possible causes, as well as the temporal association between the herd's health problems and the sludge applications (i.e., the health problems arose several years after the sludge applications began, and the health problems receded after the sludge applications were discontinued).

Under applicable Georgia law, whether there is sufficient knowledge to support the McElmurrays' experts' opinions on transference of heavy metals from dairy feed to the cows who consume the feed, and on the effect of the heavy metals on the cows' immune systems, goes

to the weight and credibility of their testimony and not to its admissibility.[51] The experts' explanations for their opinions as to causation were sufficient to authorize a jury to find that the McElmurrays have demonstrated a reasonable probability of a causal connection between their injuries and Augusta-Richmond County's acts, and that they have not left the matter to pure speculation or conjecture.[52]

(c) The trial court also awarded summary judgment to Augusta-Richmond County on the McElmurrays' claims for future lost profits,[53] and the McElmurrays have not shown error in this ruling.

(d) The court awarded summary judgment to Augusta-Richmond County on the McElmurrays' claim for the diminished value of their lands and for remediation costs.

Because this ruling was based on rules applicable to the recovery of damages in suits on contracts and not to suits on torts,[54] the correctness of the ruling is moot. Moreover, the trial court's determination that these damage claims are too speculative to support a recovery under a breach of contract theory was based, at least in part, on a misinterpretation of the record. In this regard, the court found that one of the McElmurrays' experts had testified that it was probable that pre-remediation soil sampling or testing would determine that remediation was not necessary. Our review of the record shows that the expert, in fact, testified that the probability was that remediation would be required. And although the court found that the McElmurrays' expert had admitted that the data that had been collected was insufficient to draw any conclusions as to the presence of hazardous concentrations of heavy metals in the soil on *all* of the McElmurrays' fields, this expert also testified that concentrations exceeding levels that have required cleanups in prior recorded cases have been found on the fields tested even though years have elapsed since the sludge was applied. Furthermore,

> the rule against the recovery of vague, speculative, or uncertain damages relates more especially to the uncertainty as to cause, rather than uncertainty as to the measure or

---

[51] See *Jordan v. Ga. Power Co.*, 219 Ga. App. 690, 693 (1) (466 SE2d 601) (1995) (citing OCGA § 24-9-67, distinguishing *Daubert v. Merrell Dow Pharmaceuticals*, 509 U. S. 579 (113 SC 2786, 125 LE2d 469) (1993)).

[52] *Head v. Sears Roebuck & Co.*, 233 Ga. App. 344, 345-346 (503 SE2d 354) (1998); see *Norfolk Southern R. Co. v. Baker*, 237 Ga. App. 292, 295 (1) (514 SE2d 448) (1999); compare *Motorola*, supra at 679 (1) (physical precedent only).

[53] See *Radlo of Ga. v. Little*, 129 Ga. App. 530, 533-535 (2) (199 SE2d 835) (1973) (loss of prospective profits from future sale of ungrown crops or unborn livestock too speculative and remote to be recoverable).

[54] See OCGA § 13-6-2; *Postal Telegraph-Cable Co. v. Kaler*, 65 Ga. App. 641, 644 (16 SE2d 77) (1941).

extent of the damages. Mere difficulty in fixing their exact amount, where proximately flowing from the alleged injury, does not constitute a legal obstacle in the way of their allowance, when the amount of recovery comes within that authorized with reasonable certainty by the legal evidence submitted.[55]

A plaintiff who establishes injury causation but fails to furnish sufficient data to enable a jury to estimate actual damages with reasonable certainty may still recover nominal damages.[56]

(e) The trial court ruled that the McElmurrays' breach of contract claim is barred by a clause in the parties' agreement under which the McElmurrays agreed to "indemnify and hold harmless" Augusta and other entities "for any and all claims, demands, causes of actions or suits, of any kind whatsoever arising from the land spread application program, and all activities incident to said operation." Because a jury could interpret this clause as an agreement by the McElmurrays to indemnify the city from claims of third parties and not as an agreement to refrain from bringing suit on claims that the McElmurrays themselves might have against the city,[57] the court erred in awarding summary judgment to Augusta-Richmond County on this ground.

*Judgment affirmed in part and reversed in part. Ruffin, C. J., Blackburn, P. J., and Barnes, J., concur. Andrews, P. J., Johnson, P. J., and Mikell, J., dissent.*

ANDREWS, Presiding Judge, dissenting.

Because the damages claimed in this case did not occur as a result of the county's negligent use of a motor vehicle, they are not covered by the liability insurance purchased by the county. Therefore, I disagree with the majority's conclusion that the State has waived sovereign immunity and I respectfully dissent.

A county enjoys the same constitutional sovereign immunity as the State. Waiver of a State's sovereign immunity, like waiver of any constitutional right, is strictly construed in favor of the holder of the right. *Pennhurst State School &c. v. Halderman*, 465 U. S. 89, 99 (104 SC 900, 79 LE2d 67) (1984). See also *Crider v. Zurich Ins. Co.*, 222 Ga. App. 177, 178 (474 SE2d 89) (1996). The majority's expansive interpretation of OCGA § 33-24-51 ignores this rule.

---

[55] *Ga. Ports Auth. v. Servac Intl.*, 202 Ga. App. 777, 780 (3) (415 SE2d 516) (1992) (citation and punctuation omitted).

[56] *Crawford & Assoc. v. Groves-Keen, Inc.*, 127 Ga. App. 646, 650 (194 SE2d 499) (1972).

[57] See *Cash v. Street & Trail, Inc.*, 136 Ga. App. 462, 465 (221 SE2d 640) (1975); *Batson-Cook Co. v. Ga. Marble Setting Co.*, 112 Ga. App. 226, 229-230 (144 SE2d 547) (1965).

As the majority opinion states, the sludge was spread on the McElmurrays' land from 1979 until 1990. The damages claimed by the McElmurrays as a result of this sludge have no relation to the manner in which the sludge was applied to the land and did not occur during the spreading of the sludge. This case did not arise because Augusta-Richmond County spread the sludge. The claimed injuries would exist regardless of what means were used to spread the sludge.

A close reading of the only case relied on by the majority, *Mitchell v. City of St. Marys*, 155 Ga. App. 642 (271 SE2d 895) (1980), reveals that it does not support the majority's conclusion. In *Mitchell*, the plaintiff was sprayed with insecticide from a truck spraying for mosquitoes in the area. Id. at 642-643. The court in *Mitchell* stated:

> Exact definition of the term "use" is elusive, and is not capable of a definition which will leave everyone "comfortable." Whether or not an injury arose from the "use" of a motor vehicle within the contemplation of a liability policy or statute depends upon the factual context of each case. In this setting the term does not imply "remoteness," but does extend beyond actual physical contact. And it would seem to extend at least to the point, beyond physical contact, *where control over the instrumentality is easily or reasonably at hand, and particularly when it is still being "utilized."* It follows that where a truck is being used for mosquito eradication, damages resulting from the spraying of insecticide from that truck are injuries arising by reason of the "use" of that truck.

(Citation and punctuation omitted; emphasis supplied.) Id. at 645.

In *Mitchell*, as previously discussed, the injury occurred while the truck was being operated to spray for mosquitoes and resulted from the negligent operation of the mosquito-spraying truck. This case bears no relation to the facts in *Mitchell*. Moreover, under the reasoning in *Mitchell* set out above, the damages caused by the sludge could not be the result of the "use" of a motor vehicle. The injuries occurred long after the trucks were "easily or reasonably at hand," and certainly long after the trucks were still being "utilized." Id. As the opinion states, although the term "use" can still be contemplated at a time beyond actual physical contact, it should not be considered when the contact is "remote." Id.

The majority cites to no case other than *Mitchell*, and, as stated, that case does not support the conclusion. On the other hand, there are numerous cases which support a different result. See, e.g., *Harry v. Glynn County*, 269 Ga. 503 (501 SE2d 196) (1998) (not "use" of ambulance even though part of diagnosis and treatment complained

of occurred while appellant was being transported to the hospital); *Saylor v. Troup County*, 225 Ga. App. 489 (484 SE2d 298) (1997) (injury did not arise from use of van where appellant was injured by blade attached to bumper of a county-owned van).

Also helpful is *City of Rossville v. Britton*, 170 Ga. App. 1 (316 SE2d 16) (1984). In that case, a garbage truck placed a dumpster in position two days before it fell and injured a child. This Court held that the injury did not arise from the "use" of the garbage truck, stating that the term "use" relates to the vehicle itself and excludes acts that are only remotely connected with its maintenance, use, or operation. Id. at 3. The court determined that a construction that would find coverage for something done two days before the accident happened would "impart to it an artificial meaning at variance with the apparent intention of the parties." Id. See also *Dolly Griffin & Assoc. v. Intl. Indem. Co.*, 220 Ga. App. 376 (469 SE2d 464) (1996) (injury resulting from collision with parked trailer that occurred 11 days after trailer was transported by insured tractor was too remote from and did not result from the use of the tractor).

Therefore, in light of the above, I find no support for the majority's conclusion that the claims at issue in this case are the result of county employees' negligent use of a motor vehicle. Thus, they are not covered by the county's insurance policy. Therefore, there has been no waiver of sovereign immunity.

I am authorized to state that Presiding Judge Johnson and Judge Mikell join in this dissent.

DECIDED JULY 11, 2005 —
RECONSIDERATION DENIED JULY 27, 2005 — 

*Decker, Hallman, Barber & Briggs, Richard P. Decker, F. Edwin Hallman, Jr.*, for appellants.

*Burnside Wall, James W. Ellison, Kilpatrick Stockton, Robert P. Sentell III, McKenna, Long & Aldridge, Carol R. Geiger*, for appellee.

