# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- ) | |
| ) | |
| Tele-Consultants, Inc. ) | ASBCA No. 58129 |
| ) | |
| Under Contract No. 000000-00-0-0000 ) | |

APPEARANCES FOR THE APPELLANT:      Thomas O. Mason, Esq.
                                    Francis E. Purcell, Jr., Esq.
                                      Cooley LLP
                                      Washington, DC

APPEARANCES FOR THE GOVERNMENT:     Ronald J. Borro, Esq.
                                      Navy Chief Trial Attorney
                                    Ellen M. Evans, Esq.
                                      Senior Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE MELNICK ON THE GOVERNMENT'S MOTION TO DISMISS OR ALTERNATIVELY FOR SUMMARY JUDGMENT

Tele-Consultants, Inc. (TCI) was a subcontractor to a prime contractor providing program, engineering, and support services to the United States Navy. The prime contractor was terminated for default before paying $282,302 in alleged charges to TCI. TCI unsuccessfully sought payment from the Navy, which it then followed with submission of a certified claim. It now appeals the denial of that claim. Currently, the government has pending a motion to dismiss for failure to state a claim upon which relief may be granted, or alternatively for summary judgment. For the reasons, stated below, we deny the motion to dismiss but grant the motion for summary judgment.

## STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

The following facts are undisputed:

1. In September 2009, the Naval Undersea Warfare Center, Newport Division, issued Solicitation No. N00024-09-R-3231 for offers to enter into a task order to provide program and engineering management, as well as support services for various Navy activities. The resulting contract was to be cost-plus-fixed-fee. (R4, tab 1) The

solicitation required government approval of subcontractors (R4, tab 1 at 36).[1] Cost and technical proposals from both the prime contractor offerors, and their potential subcontractors, were to be uploaded into the Navy's Seaport electronic portal (R4, tab 1 at 46, 48).

2. In response to the solicitation, Advanced Solutions for Tomorrow (ASFT) submitted a proposal on 7 October 2009, identifying TCI as one of its subcontractors (supp. R4, tab 9). Accordingly, TCI submitted proposal materials of its own to the Navy (app. supp. R4, tab 4). On 15 June 2010, the Navy awarded Task Order N408 under Contract No. N00178-04-D-4003 to ASFT (R4, tab 2). The task order included work on Non-Propulsion Electronic Systems (NPES) (R4, tab 1 at 14). ASFT and TCI then entered into a subcontract to perform work for that prime contract (app. supp. R4, tab 77).

3. It is standard procedure at the Naval Undersea Warfare Center, Newport for a non-government employee, whether contractor or subcontractor, to receive a computer, workspace, a badge, and an email address. A badge is necessary to enter the facility. (Supp. R4, tab 14, Abraham decl. ¶ 7) Also, the task order required all personnel to comply with badge and security procedures required to gain access to any government site (R4, tab 1 at 22).

4. In September 2010, Mr. Tom Isenbergh, a Navy Information System Specialist who served as a Tomahawk Weapons Control Systems Training Manager, contacted ASFT about funding a particular team of people "as a sub on the...contract." ASFT responded that it "would be glad to transfer your team to the NPES contract by having them employed by one of the ASFT Team members." (App. supp. R4, tab 44) Mr. Isenbergh then provided the names of the relevant people, with pertinent information, to Mr. John Boucher of TCI, explaining that the Navy was seeking quotes from "subs" (app. supp. R4, tab 48 at 1836). Mr. Boucher responded to Mr. Isenbergh with "costs for TCI and the pass-thru." He explained that "[t]here are options that may be available to us going forward that we can dispose of the pass-thru." (App. supp. R4, tab 49) On 4 October 2010, Mr. Isenbergh sent an email to David Hickey, the contracting officer's representative (COR) on the ASFT contract, as well as other Navy personnel, and copying both Mr. Boucher and Mr. Dennis Craft of ASFT. The email requested "funding for TCI on the ASFT NPES contract." (App. supp. R4, tab 55) TCI personnel then worked on tasks authorized by Navy personnel, and TCI submitted information about its performance of the ASFT task order (Boucher decl. ¶¶ 15-17 (attached to appellant's opposition to the government's motion to dismiss for lack of jurisdiction)).

---

[1] References to page numbers in the Rule 4 file are to those in the bottom right corner.

5. On 27 January 2011, Mr. John Corbett, another Navy manager, sent Mr. Boucher an email seeking a "spend plan vs actual expenditures graph," which he had expected from TCI previously in a meeting with the COR. Mr. Corbett also explained that the information was necessary because of the COR's prior emphasis on funding limits and need for regular reports. Mr. Boucher responded with the information. (App. supp. R4, tabs 68-69)

6. On 14 February 2011, the COR instructed Mr. Boucher to remove all TCI employees from the work site and stop billing under the ASFT contract. The next day, ASFT sent an email to TCI ordering it to stop work under the subcontract. (Boucher decl. ¶ 22) On 25 February 2011, TCI's Executive Vice President, Michael Girard, sent a letter to Denise Abraham, Deputy Department Head at the time of the ASFT contract. Mr. Girard explained that TCI was a subcontractor to ASFT. TCI understood ASFT had been ordered to stop work, and requested that the government consider retaining TCI to assume performance as the prime contractor. (App. opp'n, Renshaw decl., ex. 2) On 28 February 2011, Mr. Girard sent a memorandum to Mr. Brian O'Donnell of the Navy, noting it had incurred over $200,000 in costs on its subcontract with ASFT and "requesting that [the Navy] take an active role to resolve the issues TCI has on this task order." Mr. Girard said that ASFT had failed to execute an outstanding modification, and ended asking how "the Government intend[ed] on enabling TCI to invoice and receive payment on costs incurred since ASFT does not appear to operating [sic] at this time." (*Id.*, ex. 3)

7. On 4 March 2011, the Navy terminated a series of ASFT task orders for default, including N408 (supp. R4, tab 16).

8. On 29 September 2011, TCI's counsel submitted a letter to the Navy requesting an "equitable adjustment regarding TCI's performance as a subcontractor to" ASFT. The letter explained that ASFT had failed to pay TCI $282,302 that it claimed ASFT owed it. It acknowledged that "TCI lacked privity with the Navy with respect to its performance under the Subcontract." However, "TCI performed services supporting the Navy's mission," and "[t]he Navy benefited from these services," while "aware of TCI's performance as a subcontractor to ASFT." As "the ultimate recipient of these services, the Navy should issue an equitable adjustment to TCI in the amount of $282,302." (R4, tab 5 at 1) The letter stressed that "[t]he absence of a contract between the Navy and TCI for the work performed under the Subcontract should not serve as an obstacle" (*id.* at 3).

9. On 19 December 2011, TCI's president submitted a certified claim to the contracting officer, seeking "reimbursement for its performance as a subcontractor to" ASFT in the amount of $282,302. Like the prior request for equitable adjustment, the president's certified claim conceded that "TCI lacked privity with the Navy," but sought payment on the basis that the Navy had benefited from the services.

3

Additionally, the president argued that TCI was entitled to compensation from the Navy because ASFT had failed to take action to settle TCI's outstanding termination costs after ASFT was terminated for default. (R4, tab 6) Also, like the equitable adjustment request, the certified claim stressed that the "absence of a contract between the Navy and TCI...should not serve as an obstacle to...payment" (*id.* at 4). On 15 February 2012, the contracting officer denied the claim (R4, tab 7).

10. In a letter to the contracting officer dated 28 March 2012, TCI's counsel requested reconsideration of the final decision. Citing FAR 49.108, TCI sought the Navy to act under the FAR provisions "that permit the government to resolve subcontractor termination settlement proposals." The request included a Standard Form 1437 Settlement Proposal for Cost – Reimbursement Type Contracts. It contained various itemized costs totaling $283,004.48, plus additional attachments. (App. supp. R4, tab 85)

## PRIOR PROCEEDINGS & CURRENT MOTION

On 11 May 2012, TCI appealed the denial of its claim to this Board. The complaint contends that ASFT was the government's purchasing agent. It suggests ASFT awarded the subcontract to TCI in that capacity, which established privity of contract between TCI and the government and created a government obligation to pay TCI's invoices. TCI also alleged that the government breached a duty to cooperate in the resolution of the ASFT contract by failing to resolve TCI's claims related to that contract. The government initially answered and sought dismissal for lack of jurisdiction on the ground that it lacks privity of contract with TCI. In response, TCI generally retreated from its theory that ASFT acted as the government's purchasing agent. Instead, it alleged that the facts support the existence of an implied-in-fact contract between TCI and the government requiring TCI to perform the services for which it seeks payment. On 4 February 2013, the Board denied the government's motion to dismiss, ruling that a claimant need only allege the existence of a contract to establish the Board's jurisdiction. Whether a contract was actually formed and breached related to the merits of the appeal, which was not before the Board at that time. *Tele-Consultants, Inc.,* ASBCA No. 58129, 13 BCA ¶ 35,234. On 19 March 2014, the Board received the government's present request for dismissal for failure to state a claim upon which relief can be granted, or for summary judgment.[2]

---

[2]  After the government filed this motion, TCI filed a motion to dismiss the appeal under Board Rule 30. As part of its response to that motion, the government requested that the Chairman of the Board refer its present motions to the Board's Senior Deciding Group for decision. *See* Armed Services Board of Contract Appeals Charter, 48 C.F.R. ch. 2, appx. A ¶ 4 (2013). The Chairman has denied that request.

## DECISION

### I. Motion to Dismiss for Failure to State a Claim

To overcome a motion to dismiss for failure to state a claim, a complaint must allege facts plausibly suggesting, not merely consistent with, a showing of entitlement to relief. *Am. Gen. Trading & Contracting, WLL,* ASBCA No. 56758, 12-1 BCA ¶ 34,905 at 171,640. The government's motion does not analyze the pleadings under this standard. Instead, it criticizes the Board's previous denial of the government's motion to dismiss for lack of jurisdiction, saying it "has been unable to reconcile" it with prior decisions. Thus, the government's 19 March 2014 motion to dismiss for failure to state a claim is actually an untimely request for reconsideration of the Board's 4 February 2013 denial of the government's motion to dismiss for lack of jurisdiction. *See* Board Rule 20 (formally Rule 29) (requiring a motion for reconsideration 30 days from receipt of the underlying decision by the party seeking reconsideration). Accordingly, the government's motion to dismiss for failure to state a claim is denied.

### II. Motion for Summary Judgment

Summary judgment should be granted if it has been shown that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Summary judgment is appropriate against a party that "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" because "failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23.

#### A. Purchasing Agent

The government's motion contends that TCI can produce no evidence that the ASFT contract required it to act as the Navy's purchasing agent. TCI does not contest that suggestion now, and our review of the task order fails to reveal such a requirement.

#### B. Implied-In-Fact Contract

An implied-in-fact contract is "founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *City of Cincinnati v. United States,* 153 F.3d 1375, 1377 (Fed. Cir. 1998) (quoting *Baltimore & Ohio R.R. Co. v. United States,* 261 U.S. 592, 597

5

(1923)). The elements that must be proven by the claimant are mutuality of intent, consideration, and lack of ambiguity in offer and acceptance. Furthermore, the government representative purporting to bind it must have been authorized to do so. *City of Cincinnati,* 153 F.3d at 1377.

The government contends that TCI cannot produce evidence of an implied-in-fact contract with the Navy. It argues that none of the evidence on file, or discovery responses from TCI, show that anyone possessing contracting authority bound the Navy, or evidence a mutual intent by the parties to contract. The government also maintains that the work TCI alleges was the subject of the implied-in-fact contract was already the subject of its contract with ASFT and therefore barred from inclusion within the scope of an implied-in-fact contract. Because TCI is the party that bears the burden of proving the implied-in-fact contract, to defeat the government's motion it must proffer evidence of the contract's elements. *Celotex,* 477 U.S. at 322-23 (requiring summary judgment to be entered against a party that "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

### 1. Mutuality of Intent

TCI contends that the actions of Mr. Isenbergh and Mr. Corbett demonstrate an intention by the Navy to contract directly with TCI. However, the evidence presented shows Mr. Isenbergh contacting ASFT about funding his desired team "as a sub on the ...contract." ASFT responded that it "would be glad to transfer [Mr. Isenbergh's] team to the NPES contract by having them employed by one of the ASFT Team members." Mr. Isenbergh then explained to Mr. Boucher of TCI that the Navy was seeking quotes from "subs." When Mr. Isenbergh ultimately sought funding to pay for TCI's employment of that team, he communicated his request to the ASFT contract COR, copying Mr. Boucher and an ASFT official, explaining that he was seeking "funding for TCI on the ASFT NPES contract." (SOF ¶ 4) Separately, Mr. Corbett, another Navy manager, simply requested Mr. Boucher to provide spending information (SOF ¶ 5). None of this evidence can fairly be construed as indicating any intent on the part of the Navy individuals involved to contract directly with TCI for its services.

The only other evidence of contractual intent contradicts TCI's claim. ASFT and TCI identified TCI to the Navy as ASFT's subcontractor and they executed a subcontract between themselves. (SOF ¶ 2) TCI's Executive Vice President acknowledged in correspondence with the Navy that it had subcontracted with ASFT and sought assistance from the Navy obtaining payment (SOF ¶ 6). Both TCI's counsel and president conceded in correspondence with the Navy that TCI was a subcontractor to ASFT, lacked privity with the Navy, and that there was an absence of a contract between TCI and the Navy (SOF ¶¶ 8-9). Accordingly, TCI has failed to

6

make a showing sufficient to establish a genuine issue of fact as to the existence of a mutual intent to contract with the Navy.

### 2. Consideration

TCI suggests that, as consideration for its hiring the five individuals desired by Mr. Isenbergh, the Navy provided TCI employees with office space, access cards, and email addresses. It cites the declaration of its president, Mr. Curtis Renshaw, as support for that contention. However, Mr. Renshaw does not declare that office space, access cards, and email addresses were provided by the Navy in return for TCI providing the services of the five persons (Renshaw decl. ¶ 11). Indeed, the only evidence of the government's purpose for providing those items is that it is standard procedure to do so, and that badges are required by the ASFT task order for personnel to gain access to the government's site (SOF ¶ 3).

TCI also contends that the funding sought by Mr. Isenbergh, and that was the subject of Mr. Corbett's information request, reflects consideration for its contract as well. However, Mr. Isenbergh characterized that funding to be "for TCI on the ASFT NPES contract." He did not indicate that the Navy ever paid any consideration directly to TCI, or intended to do so, as part of a contract with it. (SOF ¶ 4) Significantly, TCI presents no evidence that anyone in the Navy promised to pay TCI directly for its performance. Accordingly, TCI has failed to make a showing sufficient to establish the existence of consideration.

### 3. Offer and Acceptance

TCI argues that Mr. Boucher's cost proposal for the five individuals' services was an offer to contract directly with the government. It says that the Navy accepted when Mr. Isenbergh directed funding toward TCI's retention of the individuals' services. Mr. Boucher proposed "costs for TCI and the pass-thru" explaining "[t]here are options that may be available to us going forward that we can dispose of the pass-thru" (SOF ¶ 4). His reference to costs and options that would dispose of the pass-thru could be construed as an invitation for discussion on the subject of a direct contractual relationship. But, "[a]n offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." RESTATEMENT (SECOND) OF CONTRACTS § 24 (1981); *see also Chattler v. United States,* 632 F.3d 1324, 1330 (Fed. Cir. 2011). TCI's reference to "options that may be available" does not manifest a bargain that can be concluded through assent. Even if it could be construed as an offer to contract directly, there is nothing in Mr. Isenbergh's request for funds that can be viewed as an acceptance of that offer. As already noted, the funding Mr. Isenbergh sought for TCI was for the ASFT task order. (SOF ¶ 4) It simply does not indicate that it constitutes

7

an acceptance of an offer to contract directly with TCI. Accordingly, TCI has failed to make a showing sufficient to establish the existence of an offer and acceptance.

### 4. Authority to Contract

The government is not bound by the acts of agents outside the scope of their actual authority, and contractors dealing with the government take the risk of accurately ascertaining the limits of that authority even when government agents are unaware of it. *See Fed. Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384 (1947); *Harbert/Lummus Agrifuels Projects v. United States,* 142 F.3d 1429, 1432 (Fed. Cir. 1998). TCI suggests that Mr. Isenbergh, Mr. Corbett, and Mr. Hickey (the COR on the ASFT contract) possessed actual authority to bind the government to an implied-in-fact contract with it. All three of those individuals have submitted declarations stating that they do not have contracting officer warrants, and have not been delegated authority to enter contracts on behalf of the government (supp. R4, tab 14). TCI's unsupported response is that Mr. Isenbergh and Mr. Corbett "represented themselves to TCI as possessing the authority to direct the hiring of specific employees and allocate contract funds for such performance." TCI also contends that Mr. Hickey possessed knowledge of their funding activities through the modifications of the ASFT contract and by ordering TCI to stop working. (App. br. at 13)

TCI has not produced any evidence that either Mr. Isenbergh or Mr. Corbett possessed authority to contract on behalf of the government. The only evidence that has been produced regarding Mr. Isenbergh is that he inquired of ASFT whether it could provide through one of its subcontractors five individuals he wished retained, he explained his desire for that arrangement to TCI, received price quotes from it, and ultimately requested others in the Navy to provide funding for TCI on the ASFT task order (SOF ¶ 4). The only evidence presented for Mr. Corbett is that he asked TCI for financial data (SOF ¶ 5). Nothing in this evidence establishes a genuine issue of fact as to whether either person possessed contracting authority. Similarly, Mr. Hickey's knowledge of ASFT contract modifications, and his communication to TCI that it should remove its workers and stop billing, is not evidence of contracting authority either. Accordingly, TCI has failed to present any evidence that someone with actual authority bound the government to an implied-in-fact contract with it.

Alternatively, TCI contends that its alleged implied-in-fact contract received institutional ratification from the Navy. "Institutional ratification may occur giving rise to a contract where a government agency accepts benefits followed by a promise of payment by the agency or approval of payment by a senior agency official with authority to obtain reimbursement for the one providing those benefits." *Catel, Inc.,* ASBCA No. 54627, 05-1 BCA ¶ 32,966 at 163,299. TCI suggests those conditions exist here because Mr. Isenbergh and Mr. Corbett "expressly negotiated the engagement of the five TCI employees to perform support services and the amount of

funding necessary to pay those services." Additionally, Mr. Hickey directed TCI to stop work, and the contracting officer was aware of TCI's performance as a subcontractor under the ASFT contract and the benefits received by the Navy. However, as already noted, there is no evidence that Mr. Corbett negotiated anything. And the only evidence respecting Mr. Isenbergh is that he sought TCI's performance in the context of its status as a subcontractor to ASFT. There is no evidence he promised payment to TCI directly for its services, or that he possessed authority to obtain reimbursement for it. Indeed, Mr. Isenbergh declared he lacked authority to obligate funds under a contract (supp. R4, tab 14, Isenbergh decl.). Thus, this is not like *Silverman v. United States*, 679 F.2d 865 (Ct. Cl. 1982), where the agency ratified the contract by receiving performance after a senior government official with authority promised a subcontractor that it would be paid. Furthermore, the fact Mr. Hickey instructed TCI to stop work and that the contracting officer was aware of TCI's activities as a subcontractor to ASFT is not evidence of a promise to pay TCI directly for its performance. In sum, TCI has failed to present any evidence that it entered an implied-in-fact contract that was institutionally ratified.

TCI has failed to make a showing sufficient to establish the existence of any of the elements of an implied-in-fact contract between itself and the government.

C.      Navy Alleged Obligation to Process Termination Settlement

TCI's opposition to the government's motion also contains a separate section claiming the Navy should have directly sought and paid a termination settlement proposal from TCI under FAR 49.108-7 and 49.108-8. FAR 49.108 is entitled "Settlement of subcontract settlement proposals." FAR 49.108-1 begins by saying "A subcontractor has no contractual rights against the Government upon the termination of a prime contract." FAR 49.108-7 does not alter that status. It merely permits the government, when in its interest, to execute an agreement with a prime contractor and subcontractor to pay the prime funds that will be forwarded to the subcontractor as part of an overall settlement of the prime contract. FAR 49.108-8 is even less relevant since it expressly applies to terminations for convenience, which did not occur here. It typically requires prime contractors to assign to the government, as directed, all right, title, and interest under any subcontract terminated due to the termination of the prime contract. The clause expressly states that the government is not obligated to pay the settlement proposals of subcontractors, but shall settle the proposal when it is in its interest. None of these provisions grant TCI any entitlement as a subcontractor to direct payment from the Navy.

9

## CONCLUSION

The government's motion to dismiss for failure to state a claim is denied. TCI has failed to carry its burden of producing evidence of an implied-in-fact contract with the Navy. Its termination settlement proposal arguments do not relieve it of that burden or otherwise have merit. Accordingly, the government's motion for summary judgment is granted.

Dated: 3 February 2015

MARK A. MELNICK
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58129, Appeal of Tele-Consultants, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals